**HOUSTON CHAMBER OF COMMERCE et al. v. RAILROAD COMMISSION OF TEXAS et al. (No. 7367.)**

Court of Civil Appeals of Texas. Austin. June 21, 1929.

Rehearing Denied July 17, 1929.

Fulbright, Crooker & Freeman, of Houston, for appellants Houston Chamber of Commerce, city of Houston, and commercial interests of Houston.

A. H. McKnight, of Dallas, Fred L. Wallace, of Fort Worth, Baker, Botts, Parker & Garwood, of Houston, Terry, Cavin & Mills, of Galveston, Andrews, Streetman, Logue & Mobley, of Houston, and Charles C. Huff, of Dallas, for appellants railroads.

Claude Pollard, Atty. Gen., Jack Blalock, Asst. Atty. Gen., Mart H. Royston, of Galveston, and Albert L. Reed, of Dallas, for appellees.

McCLENDON, C. J. This case involves the validity of Railroad Commission circular No. 7520, issued March 20, 1928, equalizing the intrastate carload (60,000 pounds minimum) rates on sugar and molasses shipments originating at Galveston, Texas City, Sugarland, Beaumont, and Port Arthur, with the Houston rates on such shipments. Three suits were filed in the district court attacking the circular, one by the city of Houston, Houston Chamber of Commerce, and other Houston interests, and the other two by railroad companies. The suits were consolidated and tried to the court without a jury, resulting in a judgment upholding the circular and denying the relief sought. The Houston interests and the railroad companies have separately appealed.

The issues presented arise out of the following facts: Prior to April 12, 1927, the rates on sugar and molasses were based upon a graduated mileage scale which reached a maximum of 50 cents per 100 pounds at a distance of 185 miles from point of origin. Beyond this distance the rate remained at 50 cents per 100 pounds, regardless of distance; making in effect all points in Texas beyond 185 miles from point of origin common point territory. Some time prior to March 8, 1927, certain shippers instituted in the Railroad Commission a proceeding seeking a readjustment of Texas intrastate rates on sugar and molasses, predicated upon a similar readjustment of interstate rates provided in tariffs which had been filed with the Interstate Commerce Commission and were to become effective April 12, 1927. The Galveston Chamber of Commerce intervened, asking that Galveston and Texas City be grouped with Houston at the same rates in case any change from the old basis were made. The Port Arthur and Beaumont Chambers of Commerce intervened with a like prayer. The Houston Chamber of Commerce opposed the equalization, and the Imperial Sugar Company, operating at Sugarland, concurred in this opposition, requesting, however, in case Galveston and Texas City were equalized with Houston, that the Houston rates likewise be applied as maxima on shipments from Sugarland. The proceeding was carried on the Railroad Commission docket as cause No. 2551.

There was a hearing before the commission on March 8, 9, and 10, 1927. On April 11, 1927, as the result of a conference between the Railroad Commission and representatives of the several carriers, cities, and other parties interested in the proceeding, the Railroad Commission issued circular No. 7193, which in effect promulgated a graduated mileage scale of rates (on 60,000 pound minimum cars) reaching a maximum of 73 cents per 100 pounds at 975 miles. It should be noted here that the interstate rates were predicated upon 60,000 pound minimum cars which alone are affected by the commission's circular; and the rates herein discussed are limited to that class of freight. This circular was made effective at 12:01 a. m. April 12, 1927, and recited the fact that the interstate rates would then become effective as creating "an emergency and necessity for the invoking of the authority conferred upon it (the Commission) by Articles 6458 and 6459 (Revised Civil Statutes)." There was no further notice or hearing upon the matter.

March 20, 1928, the commission issued circular 7529, the one here in question, under the same docket No. 2551, and filed an elaborate opinion setting forth the grounds upon which the circular was predicated. This circular, other than in some unimportant details, provided that the Houston rates, where

less than from Galveston, Texas City, Sugarland, Beaumont, and Port Arthur, should apply as maxima (a) from Galveston, Texas City, and Sugarland to all points more than 100 miles from Houston; (b) from Beaumont to all points more than 130 miles from Houston; and (c) from Port Arthur to all points more than 150 miles from Houston. The effect of this circular was to equalize Houston and the several other shipping points involved in all territory where Houston enjoyed the benefit of the lower rate without giving to Houston a corresponding benefit in the territory in which the rates were lower from the other shipping points. Manifestly, therefore, Port Arthur and Beaumont retained the advantage of the strict mileage scale of rates in a large section of Northeast Texas, whereas in all other portions of the state more than 130 or 150 miles from Houston those ports enjoyed the benefit of the lower Houston mileage rates. The same situation was created with reference to Sugarland, Texas City, and Galveston, in that they alone retained the benefit of the lower mileage rates in a large section of Southwest Texas, but were given the benefit of the Houston lower mileage rates in all other portions of the state beyond 100 miles from Houston. In other words, while the other several shipping points were equalized with Houston in Houston territory, there was no equalization between Houston and those points in the respective territories of the latter. That this situation resulted in a palpable discrimination against Houston in favor of the other shipping points is manifest.

■ Our statutes defining and condemning "unjust discrimination" specify as coming within this definition the giving of "any undue or unreasonable preference or advantage to any particular * * * locality." Rev. St. 1925, art. 6474, subd. 1. The words "undue" and "unreasonable" are probably used synonymously. "Undue" is defined as "excessive, inordinate, disproportioned." "Unreasonable" we think is used in the sense of not having any sound basis or justification in reason. As above shown, the discrimination here wrought is manifest, and, unless it can be justified upon some ground affording a reasonable basis for the discrimination, it is necessarily excessive, inordinate, disproportioned, and beyond the power of the commission to create, and therefore void. See in this connection Railroad Commission v. Galveston (Tex. Civ. App.) 115 S. W. 94 (writ of error denied) and Railroad Commission v. Compress Co. (Tex. Civ. App.) 264 S. W. 214 (expressly approved by Supreme Court, 114 Tex. 582, 278 S. W. 1115). The several grounds upon which appellees contend that it can be reasonably maintained and, justified will be considered later.

Before considering the merits of the controversy, we will dispose of a question of procedure. Appellants contended in the trial court, and now urge, that circular 7529 was void because it was issued without notice or hearing, and therefore contravenes Revised Statutes 1925, art. 6449, which provides for ten days' notice to the affected carriers before any rates may be established by the commission.

It is not contested that notice is necessary, except where dispensed with by statute. Appellants contend that, when circular 7193 was issued on April 11, 1927, the commission exhausted its power to act under the previous notice and hearing, and, before any modification of the rates prescribed in that circular could be made, a further hearing after due notice was essential. Appellees contend, on the other hand, that circular 7193 was merely an emergency order, that the commission still held jurisdiction over the matter by reserving the question of equalization for future determination, and that further notice or hearing was unnecessary.

■■ Circular No. 7193 constituted an entire change in the basis of rates from that theretofore existing. It was an emergency order we think only in the sense that it was put into effect at midnight of the day on which it was made to meet the emergency of the effectiveness of interstate rates at that time. If the order had disposed of the entire matter then before the commission, we would have an entirely different question; but such was not the case. The matter then pending before the commission involved the entire subject of sugar and molasses rates in Texas, and the circular merely prescribed the general basis of rates without passing upon the equalization matter which had been brought into the case and was then pending before the commission. While conceding the necessity of notice and hearing, and conceding that such necessity applies to a modification of a commission rate as well as to an original rate made by the commission (see Rev. St. 1925, art. 6448, subd. 6), we are of the view that it is not essential that the commission dispose of a matter pending before it in a single order, but that it may in a proper case make a preliminary disposition of the matter, and reserve for further consideration, and dispose of by subsequent order, other questions or issues involved in the main issue without further notice or hearing. The record shows that this is what the commission attempted to do, and we hold that it acted in that regard within its powers.

The carrier appellants urge two grounds of invalidity of circular 7529 other than its discriminatory effect upon the contending cities and their respective commercial interests. These we will also consider before taking up the discrimination question.

■ First, it is contended that the circular attacked amounts to a taking of their property without due process of law. The only

evidence upon this issue was to the effect that circular 7529 effected a general reduction in the railroads' revenues from this traffic amounting to $275,000 per annum; this figure being based upon the modification made of circular 7193. There was no showing, however, that the effect of circular 7529 was to require the carriers to haul the commodity at a loss or other than at a profit, and none which brings the case within the condemnation of the constitutional provisions invoked. Const. U. S. Amend. 14, Const. Tex. art. 1, § 19. The mere fact that a rate reduces the revenue of a carrier does not of itself establish a taking of its property without due process of law. Gulf, C. & S. F. Ry. v. Commission, 102 Tex. 338, 113 S. W. 741, 116 S. W. 795.

The second contention is that the circular attacked is void under the commerce clause of the Federal Constitution (Const. U. S. art. 1, § 8, cl. 3), in that its purpose was to influence the movement of interstate and foreign commerce through the several ports of Texas affected by the circular. The gist of this contention is that, by establishing a rate beyond a certain mileage distance common to two or more ports, the effect would be to distribute the imports among the several ports; whereas under the mileage scale the shipments would flow through the ports having the natural advantage of proximity to the ultimate destination points. It is, of course, indisputable that intrastate rates which have the effect of attracting foreign or interstate shipments to particular points or ports within the state affect in that regard the movement of interstate and foreign commerce. But to some extent any intrastate rates made by the state commission upon commodities which move also in interstate traffic necessarily affect interstate movement of such commodities. The fact that both interstate and intrastate shipments are handled by the same carriers using for both characters of traffic the same facilities necessarily so interrelates the two characters of traffic that whatever affects one must necessarily to some degree affect the other. If the state commission, therefore, could make no orders which affected interstate commerce, it would be wholly without authority in rate making, or at least for all practical purposes virtually so. To contravene the commerce clause of the Federal Constitution, the orders of the state body must impose some undue burden on interstate commerce. The equalization of the ports of a state with reference to a particular commodity which is largely imported into the state does not essentially or per se impose an undue burden upon interstate commerce, if it imposes any burden upon it at all. The record in this case fails to show that the particular circular in question places any such burden as would render it obnoxious to the Federal Constitution.

We come now to a consideration of the discrimination feature of the circular.

That the condition manifestly shown to result from the equalization circular results in a discrimination against the Houston interests is as already stated apparent. Appellees' justification of this circular may be reduced to the following four contentions: (1) That the remedy of the Houston interests was to apply to the commission for modification of the order; (2) that the discrimination was effected by circular 7193, concerning which there was no complaint, and not by circular 7529, which alone is attacked; (3) that the circular attacked was the proper exercise of express statutory power given the commission to establish group rates (Rev. St. 1925, art. 6474, subd. 3); (4) that the complicated terminal system at Houston with its consequent increase in cost of handling constituted a proper basis for the discrimination.

We find no merit in the first contention. The Houston interests, or at least some of them, appeared in the hearing before the commission, and protested against the equalization request of the other intervening cities. Under our Texas statutes, the making of rates is a matter confided solely to the commission, and, when rates are so made, they are the rates of the commission; upon whose initiative they may be made being immaterial. The commission is charged by statute with the duty of making just, reasonable, and nondiscriminatory rates (Rev. St. 1925, art. 6448), and such rates, when made, are conclusively presumed to be just, reasonable, and nondiscriminatory until attacked in a direct proceeding authorized by statute for that purpose. Rev. St. 1925, art. 6452; Railroad Commission v. Weld & Neville, 96 Tex. 394, 73 S. W. 529; Missouri-Kansas & T. Ry. v. Commission (Tex. Civ. App.) 3 S.W.(2d) 489, affirmed (Tex. Com. App.) 13 S.W.(2d) 679, 680. In the hearing before the commission, the only notice that is required is that given to the railroad companies, whose interests are affected. Shippers, localities, and others who may be affected or interested are not required to be given notice. But, when the rates are made, and whether or not the parties interested other than the carriers are notified or appear, they are given the express statutory right to bring in question the unreasonableness, unjustness, and discriminatory effect *to them* of such rates. Rev. St. 1925, arts. 6453, 6454. The trial in such a proceeding is by express statute governed by the same rules as civil causes generally, and there is no limitation other than that which affects civil causes generally upon the rights of the parties to be heard or to introduce evidence. It is clearly not incumbent, we think, upon any party aggrieved by any rate of the commission, as a condition precedent to his right to contest the validity of such rate, to first apply to the commission to undo or modify what it has al-

588

ready done. Especially should this be true where, as here, the aggrieved party appeared before the commission and protested against the rate before it was promulgated.

■ There is another reason, equally cogent and, we think, conclusive, why application to the commission for relief should not be required. In rate making, the functions of the commission are legislative in character and its orders prospective in operation. The commission cannot set aside, annul, or grant relief from the effect of any rate it may make. It may modify or repeal, and so extend relief prospectively; but, in so far as its orders already made are concerned, the courts alone can give relief. See Missouri-Kansas & T. Ry. v. R. R. Com. (Tex. Civ. App.) 3 S.W.(2d) 489.

■ Nor do we think there is substantial merit in the second contention. Under circular 7193, all of the shipping points here under consideration were placed upon an equality of rates from the viewpoint of a graduated mileage scale. This gave to each shipping point an advantage in the territory in which the distances from it were the shortest. Houston had no objection to this circular, and did not deem itself injuriously affected thereby. The contention is that this circular furnished the basis for the discrimination here complained of, in that but for this circular all points beyond 185 miles from the several shipping points in question were concededly common point territory. Circular 7193 inaugurated a wholly different system of rate making. It placed practically all of the state on a graduated mileage scale basis, which, other things being equal, is generally conceded to be a fair and equitable rate-making principle. The discrimination here complained of was the result of circular 7529, the effect of which was so to modify circular 7193 as to equalize the several named ports with Houston in Houston territory, without giving to Houston a corresponding equalization in the territory of these respective ports. We see no virtue in the contention that this condition was brought about in any proper sense by circular 7193.

■ We overrule the third contention. The commission is given express power to make group rates (Rev. St. 1925, art. 6474, subd. 3), a practice well known in rate making in this country, and one resorted to both by federal and state commissions. So long as grouping is based upon proper considerations, and does not operate unjustly, unfairly, or in a discriminating manner, the power of the commission to make group rates cannot be questioned or its action in so doing reviewed by the courts. Whether the several shipping points at issue can properly be grouped so as not to invade the limitations placed upon the commission is a question we find it unnecessary to decide. The equalization order here complained of is not, we think, a proper

application of the grouping system. Grouping, of course, effects an equalization among the several ports or shipping points constituting the group, but the equalization here is confined strictly to that territory which lies nearest Houston beyond the respective 100, 130, and 150 mile zones. As to Port Arthur and Beaumont, this equalization is in the territory where the Houston rates on account of shorter distances are lower than those from Beaumont or Port Arthur. But there is no corresponding equalization in the rates in that territory in which the distances from Beaumont or Port Arthur are less than from Houston. This is palpably a discrimination against Houston and in favor of Beaumont and Port Arthur. The same situation exists with reference to Sugarland, Texas City, and Galveston on the one hand and Houston on the other. The record does not present any basis whatever for this discrimination, and we are unable to reach the conclusion that the order complained of is in any proper sense an exercise of the commission's power, either statutory or otherwise, to make group rates.

■■ The fourth contention we overrule because we believe the record will not support it.

We quote in full those portions of the commission's opinion which deal with this phase of the question:

"Much testimony was introduced by Galveston, and concurred in by Texas City, in support of these equalization petitions, the purpose of which was to show:

"1. That naturally in the commercial handling of this commodity, without equalization and with the water rates the same to all ports, this import sugar will move through that Texas port storage point having the lower rates to the Texas destination, to the exclusion of all other Texas ports; and

"2. That commercial, as well as operating, conditions altogether justify the observance of rates from Galveston and Texas City no higher than from Port Houston, which latter point takes Houston rates on all traffic.

"The correctness of the first proposition, it was claimed, is obvious, and in support of the second proposition, among others there was particularly stressed the contention that a large percentage of the traffic from Galveston and Texas City, in moving to Texas destinations, must or does move through Houston, and that the cost to the carrier of moving such traffic from the loading point at Galveston or Texas City, through the not extended or complicated railroad terminals at those points and to the railroad train make-up yards in Houston is not greater than the carrier cost of handling similar traffic from storage warehouses at Port Houston, through the extended and complicated railroad terminals in Houston, to the same railroad train make-up yard in Houston.

"While in the opinion of the Commission,

this showing that the advocates of equalization undertook to make in support of their plea cannot be regarded as definitely and conclusively proving their contention, in its last analysis, it is, we think, worthy of serious consideration and is, we further consider, conclusive of the fact that the difference, if any, in the relative transportation cost as between hauls from Galveston-Texas City and from Port Houston is much less than what might be measured by the 50 miles distance between Houston and Galveston; and the weight that should be given to this testimony goes far, in our opinion, towards justifying the equalization asked. It may cost *no* more to perform a 50 mile road haul service between Houston and Galveston, considering the operating conditions between those points, than it costs to perform from 15 to 20 miles of switching service through the railroad terminals in the City of Houston. The affirmative of this would seem to be supported by the fact that a car (one of a train of from 75 to 100 cars) can and does move between Houston and Galveston in from 3 to 4 hours, while it often takes much in excess of that length of time, in the ordinary course of handling for a car to move from the train break-up yard in Houston to Port Houston on the Ship Channel, or vice versa. But, based on the testimony in this case, we are not prepared to, at this time, make such a definite finding. However, we can and do reach the very definite conclusion that the difference in these relative costs is sufficiently reduced to justify the ignoring of same after the road haul reaches the proportions that would be involved, in the case of shipments from Galveston or Texas City moving through Houston, in reaching destinations in Texas beyond 100 miles from Houston.

"There is also another consideration that supports the plea for this equalization. The carriers in this case do not oppose equalization if it can be effected without reducing the revenue they will receive for the transportation of this commodity. If it is true, and it appears entirely probable to us, that in the commercial handling of this commodity, without equalization and with equal water rates to all of these Texas ports, this import sugar will move only through that Texas port having the lower rates to the Texas destinations, it would seem equally obvious that, with equalization, there would be no reduction in the revenue that the carriers will receive from the transportation of this imported sugar, since, in either case, revenue based on Houston rates will be what they will receive for their services. Without equalization this sugar will move through Port Houston at Houston rates, and with equalization it will move through either of these ports at Houston rates. The difference, if any, to the carriers will be not in revenue but in the amount of cost to them of the relative service performed. This difference, if any, must, we

think, be small and such as can be, for the sake of the commercial advantages to be derived from equalization among shippers and handling facilities, ignored in connection with the total hauls hereinbefore referred to.

"But this equalization, if it is to be made effective, cannot be restricted to the question of Galveston-Texas City vs. Houston. Beaumont and Port Arthur both have deep water and other facilities for the handling, storage and distribution of import sugar, and are equally entitled to the opportunity to participate in that business. In the case of these ports, as in the case of Galveston, the reaching of some Texas destinations is not necessarily through Houston. In other words, there are some points in Texas that are about equi-distant from Houston and Galveston and from Houston and Beaumont. To these points equalization is thoroughly justified. But, as to traffic from Beaumont and Port Arthur where the rate-basing route is through Houston, the distance of these origins over Houston is greater than the distance of Galveston over Houston—82 and 103 miles, respectively, as compared to 48 or 50 miles. If Galveston and Texas City are to be equalized with Houston, Beaumont and Port Arthur should likewise be equalized, but not at the same distance 'beyond Houston.' The difference in the distance over Houston of Beaumont vs. Galveston is about 30 miles, and Port Arthur approximately 50 miles. Therefore, if the equalization of Galveston is to come at points over 100 miles 'beyond Houston,' then the equalization of Beaumont should be at points not less than over 130 miles 'beyond Houston,' and in the case of Port Arthur 150 miles 'beyond Houston.' "

It is clear from those quotations that whatever weight the commission may have given to Houston terminal costs was predicated upon an alleged equality in cost of hauls from Port Houston and Galveston or Texas City to the Houston make-up yards. No such equality is even hinted at with reference to the hauls from Beaumont or Port Arthur to the Houston make-up yards. Manifestly, therefore, the equalization of the latter ports with Houston is in no sense rested upon relative Houston terminal costs. But, even if an added cost burden at Houston were conceded, the commission opinion shows, at most, that this consideration was employed solely in justification of an equalization of the several ports. In no sense can it be properly urged as a basis for discrimination against one (Houston) and in favor of all the others.

A mileage scale of rates necessarily leaves out of consideration the many inequalities in handling costs due to the varied local conditions everywhere encountered in rail transportation. Nor does our American system of rate making take into consideration cost differences in the several items that go to make up the total service included in the rate, as

is done in English rate making. For a discussion of this subject see Los Angeles Switching Case, 18 I. C. C. 315. The cost element is adjusted by a general average of cost differences. And that is exactly what was done in this case. Nothing was added to the mileage rate from Houston to compensate for additional terminal cost, even in the short hauls below 100 miles, as to which the equalization was not applied, and the relative inequality in terminal charges was the greatest. The rate from Houston to any point not over 100 miles distant was exactly the same as for a like distance from any of the other ports, although terminal costs, and therefore any inequality therein, were a larger element proportionately in the entire service cost for the short hauls than for the long hauls. This but illustrates the fact that in mileage scale rate-making differences in terminal and other costs are equalized and spread over the entire traffic. The opinion of the commission shows conclusively that the whole purpose of circular No. 7529 was to place the several ports on an equal basis, and that the cost of the service was considered only from the viewpoint of handling the entire commodity.

These considerations seem to us conclusive that Houston terminal costs furnish no reasonable basis for the discrimination shown.

Aside from this, however, the record shows that the terminal costs at Houston are no greater than at Galveston, and that the alleged equality in cost of haul from Port Houston and Texas City-Galveston to the Houston make-up yards does not exist.

There is a mass of testimony in the record upon this issue, the details of which we think it unnecessary to relate. Boiled down to essential features, it leaves the following residuum: While the terminal system at Houston is described as complicated, it was shown without dispute that it was "among the most modern, up-to-date, well equipped and efficiently operated terminals throughout the country." And, while some retardation in the movement of a shipment resulted from this complication, it was not shown that such complication was other than that essential to handling a large volume of traffic, or that any excess cost per car was occasioned. On the other hand, switching charges at Houston were no greater than at Galveston, and the port terminal charges from Port Houston to Houston make-up yards were less than those at Galveston and Port Arthur.

Other factors shown without dispute were: That sugar requires a certain class of car; that in shipments from Texas City and Galveston on account of the much smaller freight movement into those ports a much larger percentage of empty cars of the class required was necessary to be hauled into those ports in order to meet the demands of the outbound sugar shipments; that such deadhead hauling was negligible with reference to Houston;

that shipments out of Galveston and Texas City into Houston territory passed through Houston with the exception of those handled by the Santa Fé system; that these shipments which passed through Houston required the same amount of handling in the Houston yards as those originating in Houston; that Houston constituted the division point for these roads, thus making the Houston-Galveston division only about 50 miles and the Houston-Texas City division somewhat less; whereas the usual division points are located at least 100 miles apart; that the cost of handling on this division was necessarily larger than that on the usual division in proportion to mileage. Taking all of these facts into consideration, we think additional terminal cost at Houston as a basis for the discrimination was negatived.

The real basis for circular No. 7529 is set forth in the concluding paragraphs of the commission's opinion, which we quote:

"Texas is fortunate in having several ports along its coast line, ports established with a statesmanlike vision for the future development of our great natural resources, our unlimited agricultural possibilities and the serving of our manufacturing and commercial needs, the large development of which it takes no prophetic powers to foresee and foretell. Not only are these ports designed to serve Texas but they are to serve and are serving now, in a very large way, other States in the Southwest and Middlewest as outlets for their products, as well as providing import gateways for traffic from the Atlantic and Pacific Coasts and from foreign countries. The interest of the general public, not only in Texas, but many of the other states, in the development of these ports is greater than the interest of the individual port cities themselves.

"Our ports have been developed largely by the Federal Government. While this is true, it is also true that cities and communities in the form of bond issues and remitted taxes, and the State in the form of remitted taxes, have likewise contributed heavily to their development. Houston has been the chief opponent of equalization of these rates with Galveston, pointing out the tremendous sums raised by local taxation and spent in aid of making that city one of the major ports. That it has planned and spent wisely the results abundantly prove.

"It is our view that our answer to this question of equalization should reflect what in our careful judgment would be for the best interest of the State and the country as a whole, having in mind at the same time the necessity of allowing a fair return to the carriers, and the maintenance of a fair relative adjustment as between the different ports. There is not now, and we trust never will be, any purpose of this Commission to prefer one port over another, or, by any rate adjustment, place one port at a disadvantage over another,

and our action in this case cannot fairly be said to have such effect. There is, as we see it, nothing to prevent one port from competing with another on equal rates. Surely it is to the advantage of the general public—the producer and the consumer—to have our ports on as nearly an equal basis, all things considered, as possible. Port cities become leading markets for many agricultural and manufactured products, and distributing centers for many of the necessities and comforts of life. If they are developed so that they may be strong competitors both in purchase and distribution this will undoubtedly be to the public interest."

This may be regarded as an eloquent argument in favor of equalizing the ports of Texas, but, in our opinion, it affords no justification for the discrimination made against Houston.

The judgment of the trial court is reversed, and judgment is here rendered canceling and annulling commission circular 7529, and perpetually enjoining its enforcement.

Reversed and rendered.