RAILROAD COMMISSION OF TEXAS et al. v. TEXAS STEEL CO.

Motions Nos. 7066, 7067, 7554.

Court of Civil Appeals of Texas. Austin.

Feb. 18, 1931.

On Rehearing Oct. 14, 1931.

C. C. Huff and T. D. Gresham, both of Dallas, Baker, ·Botts, Parker & Garwood, of Houston, Terry, Cavin, & Mills, of Galveston, Adair Dyer, of Dallas, and Goree, Odell & Allen, Thompson & Barwise, and Fred L. Wallace, all of Fort Worth, for appellant railroad companies.

Jas. V. Allred, Atty. Gen., and H. D. Bishop, Asst. Atty. Gen., for appellant Railroad Commission.

Geo. W. Armstrong, of Fort Worth, and J. W. Hornsby, of Austin, for appellee.

BLAIR, J.

Appellee Texas Steel Company, a corporation domiciled at Fort Worth, Tex., and engaged in manufacturing iron and steel articles for sale and intrastate shipment, instituted this proceeding as an appeal from an order of the Railroad Commission of Texas, refusing to grant appellee relief against the intrastate freight rates on iron and steel articles established by the Railroad Commission by its order of April 26, 1922, as amended by its order of June 15, 1922, as well as against the practice of the carrier defendants in the use of a 2-cent transit privilege in connection with interstate rates on iron and steel articles, appellee alleging that such rates and practice were unjust, unreasonable, and discriminatory, as applied to it. Judgment was for appellee canceling the April–June, 1922, rates, and enjoining the defendant carriers from collecting same; hence this appeal by the carriers and the Railroad Commission, the Railroad Commission merely adopting the carriers' briefs.

The history of the rates in question is as follows: In March, 1915, the Railroad Commission adopted commodity tariff No. 48–A, establishing certain intrastate freight rates on iron and steel articles, which rates were canceled November 1, 1916, and, in lieu thereof, the higher rates requested by A. C. Fonda, as agent for the carriers and others, were put in effect. The Fonda rates, plus an increase of 25 per cent. made by the Director General of Railroads during government control of railroads, and plus an increase of 35 per cent. authorized by the Interstate Commerce Commission in 1920, were ratified and adopted by the Railroad Commission by the order of April 26, 1922, as amended, and reduced 10 per cent. by the general order of June 15, 1922, which rates appellee was and is now required to pay.

Appellee's plant was not operated from 1921 to 1924, both inclusive. In September, 1924, appellee applied to the Railroad Commission for relief against the April–June, 1922, rates here complained of, but, after the hearing, the application was taken under advisement and no order was ever made. In November, 1927, appellee again applied for relief against these rates, but the order entered was set aside by agreement. In 1928, appellee again applied for relief against the rates in question and against the practice of appellant railroads giving to interstate shipments of iron and steel articles what is known as the "fabricating in transit privilege," as set out in appellee's plea of intervention in the application of A. C. Fonda, No. 945, appellee also praying that the March, 1915, rates be re-established as just and fair intrastate rates on iron and steel articles; but this plea was refused by the Railroad Commission in October, 1928, as follows:

"If such allegations of the Intervener are correct, there is justification for the conclusion that the practice, in connection with the use of the interstate transit privilege,

should either be corrected or that the Intervener should have some relief against it. Being without jurisdiction in connection with these interstate transit rules and their application, a way by which we could effect the correction is doubtful. The question then is, could we afford to the Intervener the relief to which it might be found that it has shown itself to be entitled.

"Considering all the angles involved in these proceedings, a way by which we could afford such relief is not apparent.

"In the first place, in the Consolidated Southwestern decisions prejudice and preference have been found in connection with both the present Texas intrastate rates on iron and steel articles and on scrap iron, the removal of which is the primary purpose of these proceedings before us. Based on the evidence before us, we might or we might not be able to find that Column 32½ rates are unreasonable per se for application to Texas intrastate traffic, but, even so, if the present Texas intrastate rates, which are lower than the Column 32½ rates applied interstate, are subject to the finding, as has been made, that they produced discrimination against interstate commerce then how could we remove that discrimination by, instead of putting them on the Column 32½ level, lowering the Texas intrastate rates to the level the Intervener asks? It has for some time been the policy of this Commission to work co-operatively with the Interstate Commerce Commission in instances where both interstate and intrastate rates are involved and discrimination is charged, and in view of the presently outstanding finding of discrimination and preference in connection with the present Texas intrastate rates, and of the numerous findings of the Interstate Commerce Commission that practically the entire Southwest is a homogenious territory so far as traffic and transportation conditions are concerned, and in the absence of a definite showing that the Column 32½ rates are unreasonable per se, we are assured that it would be very inconsistent on our part and improper to definitely undertake to determine what, if any relief, the Intervener may be entitled to in other than some future joint proceeding heard co-operatively by the Interstate Commerce Commission and this Commission."

Appellee instituted this proceeding as an appeal from the preceding order of the Railroad Commission, alleging (a) that the April-June, 1922, rates were unjust and unreasonable as applied to it; that same were more than the traffic would bear, and tended to confiscate its property in violation of the fundamental laws of both state and nation; and (b) that the rates were unjust, unreasonable, and discriminatory as applied to appellee, in that the effect of the practice of the carriers in connection with the use of the interstate "fabricating in transit privilege," was to and did give appellee's competitors (importers, dealers, and fabricators of iron and steel articles who enjoyed the interstate fabricating in transit privilege) preferential and lower rates on shipments of iron and steel articles moving wholly within Texas as intrastate business, and which practice prevented appellee from competing in the market with said competitors, and, in effect, confiscate its property; and that said rates were void because the Interstate Commerce Commission was without jurisdiction to prescribe rates in the state of Texas, and that it was the duty of the appellant Railroad Commission to determine the justness, reasonableness, and the discriminatory effect of said rates as applied to appellee. The carriers answered by a general demurrer, a special exception or plea that the rates and transactions here complained of were so related to the interstate rates established with the fabricating in transit privilege as to deprive the Railroad Commission of any jurisdiction, and to confer exclusive jurisdiction in the premises upon the Interstate Commerce Commission, and a general denial.

The Railroad Commission adopted the carriers' answer, and sought to sustain its above-quoted order.

In substance, the trial court found (a) that the rates complained of were unjust and unreasonable as applied to appellee; and (b) that same were unjust, unreasonable, and discriminatory as applied to appellee in connection with the practice of the carriers in the use of the "fabricating in transit privilege; that the transit privilege related to wholly intrastate business over which the Interstate Commerce Commission had no jurisdiction, but that it was the duty of the Railroad Commission of Texas to determine such matters. Upon these findings, the trial court canceled the April–June, 1922, rates as applied to appellee, and enjoined the carriers from demanding or collecting same from appellee.

The trial court's finding that the April–June, 1922, intrastate rates on iron and steel articles were in themselves unjust and unreasonable is not sustained by the evidence. Appellee's president and owner testified as follows: " * * * We simply cannot pay these freight rates, they are prohibitive; I cannot pay them and meet the competition of the other fellow with the lower rates. * * * my company, during this period that this rate hearing has been pending has lost approximately three hundred thousand dollars, and that while we are now probably breaking even and a little bit better than breaking even, it has only been a matter of a few months. * * * The two-cent transit privilege operates against the company and that we have not got the advantages that our competitor has and cannot meet the ad-

vantages of the transit rate. * * * The difficulty I am experiencing does not arise entirely from this transit privilege applying on interstate shipments of iron and steel articles into Texas; it arises partially from that and partially from the fact that my rates are unreasonably and unconscionably high. * * * I would say that the 2-cent transit privilege is the principal complaint; I will reconsider the question Mr. Thompson asked me to that extent. But I complain not only that the 2-cent transit privilege gives my competitors advantage of a lower rate, but I complain, too, that the rates are unjust and particularly too high and out of joint with the rates on other commodities."

The effect of this testimony is that if appellee's competitors were compelled to pay the intrastate rates required of appellee in lieu of the 2-cent transit privilege, plus differentials where applicable, appellee would then be able to compete in the open market and on equal footing with the fabricators of iron and steel articles. It is true that appellee introduced evidence tending to show that rates on iron and steel articles had increased since 1915 as much as 162 per cent. in some instances, and on the whole about 40 per cent. There was also evidence that, in comparison with other commodities, the returns to carriers were much greater on iron and steel articles, due in a large measure to the fact that less care in the selection of transportation facilities and care in transit was required for shipment of iron and steel than for other commodities. But this evidence does not warrant the holding that the April–June, 1922, intrastate rates as established by the Railroad Commission were in themselves, or standing alone, unjust and unreasonable. Railroad Commission of Tex. v. Weld & Neville, 96 Tex. 394, 73 S. W. 529; Gulf, C. & S. F. Ry. Co. v. Railroad Commission of Tex., 102 Tex. 338, 113 S. W. 741, 116 S. W. 795; Houston Chamber of Commerce v. Railroad Commission of Tex. (Tex. Civ. App.) 19 S.W.(2d) 583. We pass to the question of whether such rates are unjust, unreasonable and discriminatory as applied to appellee in connection with the use by the carriers of the interstate fabricating in transit privilege.

The facts show that appellee is what is known as a rolling mill, engaged at Fort Worth, Tex., in manufacturing for sale iron and steel articles, and is the only mill of its character operated in Texas. Like mills are operated in Minnequa, Colo., Kansas City and St. Louis, Mo., and Birmingham, Ala., and other out of state places, which, generally speaking, are located north and west from Fort Worth, Tex., and beyond a radius of 600 to 800 miles. These mills sell their products to appellee's competitors, who in the main are located at Fort Worth and Dallas, Tex., and who are fabricators of iron and steel articles, and their business or trade territory is the same as that of appellee, being within a radius of about 200 miles south and south-west from Dallas and Fort Worth, and wholly intrastate, since they do not ship north or west against the interstate traffic moving south from the mills above mentioned, nor farther south or east against the traffic of fabricators at Houston and Galveston, which in the main originates from foreign shipments of iron and steel articles by water. The expense of establishing and operating a fabricating plant is very small in comparison with the expenses of establishing and operating a rolling mill plant. The fabricators at Ft. Worth, Dallas, and other Texas points, except Houston and Galveston, purchase practically all of their iron and steel articles from the mills outside of Texas, and those mills deliver same by rail at Fort Worth, Dallas, or other Texas points on interstate rates, which permit a 2-cent fabricating in transit privilege plus certain differential rates on carload shipments of iron and steel articles moving interstate on a 500-mile or over haul. These interstate rates, with the 2-cent transit privilege, plus differential rates, originated with appellant and other railroads through their various rate investigating or rate establishing and publishing agencies, who filed statements or schedules of the same with the Interstate Commerce Commission, and which rates are in use by all railroads in what is known as the southwestern territory. The effect of the practice of the carriers in the use of the 2-cent transit privilege, plus the small differential charges as applied to appellee, is stated in the trial court's findings of fact as follows:

"4. I find that the railroads permit a two-cent transit privilege upon all shipments of certain iron and steel articles interstate through which such articles, after having been delivered to Dallas, Fort Worth, Houston, and other transit points, could, prior to the cancellation of common point territory by the decision of the Interstate Commerce Commission in the Consolidated Southwestern Cases, Docket No. 13535, to-wit: on the ———— day of July, 1928, during a period of twelve months from the date of such delivery, be forwarded to common points in Texas by paying two cents per 100 pounds, and that said transit privilege was established by the railroads. Since said cancellation the fabricator is required to pay in addition to the two-cent transit, the rate prescribed by the Interstate Commerce Commission in said Consolidated Southwestern Cases for the total distance from the point of origin of the inbound shipment to the point of destination of the outbound, i. e., if certain iron and steel articles are shipped inbound a distance of 500 miles, they or like commodities having the transit privilege, may be shipped an additional 100 miles upon payment of the rate established by the Interstate Commerce Commission for the difference between a 500 and a 600-mile shipment, which is

5 cents per 100 pounds and which makes the rate to be paid by the fabricator for a shipment of 100 miles 7 cents. After a shipment moves in 500 miles the rate for each additional 100 miles out-bound varies from 5 to 6 cents per 100 pounds, with the result that the fabricator is required to pay the following rates for the following distances, to-wit, as shown in Column A below, whereas the plaintiff is required to pay the rates upon the same commodities, as shown in Column B, below:

| | 'A' Fabricators' Rate | 'B' Texas Steel Co's Rate |
|---|---|---|
| 100 miles out of Fort Worth 5 cents plus 2 cents | $.07 | .22½ |
| 200 miles out of Fort Worth 11 cents plus 2 cents | .13 | .34 |
| 300 miles out of Fort Worth 17 cents plus 2 cents | .19 | .40 |

"I further find that the transit rules of the railroads do not require that the identity of the article shipped in be preserved, but on the other hand expressly permit the substitution of one article for another of like commodities having the transit privilege, with the result that the fabricator is given credit on his outbound shipments of reinforcing concrete bars for a period of twelve months for the freight he has paid on structural material, such as angles, channels, beams, etc., even though such structural material may have been used locally. Approximately ninety per cent. of the carload shipments intrastate of iron and steel merchant and reinforcing bars sold by the competitors of the plaintiff Texas Steel Company are shipped upon this two-cent rate, which gives such competitors a great advantage in the market and constitutes an unjust and unlawful discrimination against plaintiff."

The facts also show that appellee's competitors purchase practically all the iron and steel articles which they sell and reship intrastate in carload lots on the 2-cent transit privilege from mills outside of Texas, and that the deciding factor for such purchases is the benefit of the transit privilege, which is only about one-half the intrastate rates required of appellee for the same shipments; that because the carriers allow such transit privilege, appellee is unable to sell its products in carload lots in competition with the fabricators, and that such use of the transit privilege by the carriers practically destroys appellee's business, and, in effect, confiscates its property. It is also clear that the use of the 2-cent transit privilege is to the advantage of the carriers in the matter of obtaining long hauls of iron and steel articles from the mills outside of Texas, as against the shorter hauls from appellee's plant at Fort Worth, Texas.

It is clear under the preceding facts that all interstate commerce in iron and steel articles of the character involved in this suit ended upon the delivery of same to the fabricators at Fort Worth, Dallas, and other Texas points by mills outside of Texas, and that all reshipments from such Texas points under the fabricating in transit privilege, plus the small differential where applicable, became wholly intrastate business. It is undisputable that no other destination of the iron and steel articles was intended or arranged for with the out of state mills at any point beyond the delivery to the fabricators on the original haul. There was no designation of any particular iron and steel articles for any particular point in Texas beyond the delivery to places of business of the fabricators; but on the other hand, the practice of the carriers, in connection with the use of the transit privilege, expressly permitted substitutions, with the result that fabricators might and do sell locally all or a part of an inbound shipment of reinforcement concrete bars, and, for a period of twelve months, are given credit therefor on any outbound intrastate shipment of structural steel or like commodities having the transit privilege, or vice versa. It is also undisputable that, upon the delivery of the iron and steel articles by the out of state mills to the fabricators at Texas points, the fabricators thereafter become the owners of same, and are free to distribute same according to the future demands of their business, and by substitution from their storage places of commodities of like character may thereafter meet the future variations in their business. Clearly the carriers' liability for any such shipment ceases upon delivery to the fabricators, and thereafter the fabricators become appellee's competitors in the open market with the advantage of a much lower intrastate rate because of the use of the 2-cent transit privilege, plus the small differential rates where applicable. This holding that the traffic to which the transit privilege applies lost its interstate characteristics when delivered to the fabricators, and became thereafter intrastate commerce, is fully sustained by the following authorities: Atlantic Coast Line R. Co. v. Standard Oil Co., 275 U. S. 257, 48 S. Ct. 107, 72 L. Ed. 270; Atchison, T. & S. F. Ry. Co. v. U. S., 279 U. S. 768, 49 S. Ct. 494, 73 L. Ed. 947; Gulf, C. & S. F. Ry. Co. v. State, 97 Tex. 274, 78 S. W. 495, affirmed by Supreme Court of U. S., 204 U. S. 403, 27 S. Ct. 360, 51 L. Ed. 540.

It is manifest under the preceding facts that the April–June, 1922, intrastate rates were unjust, unreasonable, and discriminatory as applied to appellee, when considered in connection with the use by the carriers of the fabricating in transit privilege, which gave appellee's competitors preferential and lower rates on reshipments of iron and steel

articles moving wholly intrastate and as intrastate commerce. But as against these evils, neither the Railroad Commission nor the trial court gave any relief. The Railroad Commission, though recognizing that appellee was entitled to some character of relief, refused to grant same upon the following reasons as stated in order:

(1) That it was "without jurisdiction in connection with these interstate transit rules and their application."

(2) That "in the Consolidated Southwestern decisions prejudice and preference have been found in connection with both the present Texas intrastate rates 'on iron and steel articles and on scrap iron" which the Commission could not remove and at the same time lower "the Texas intrastate rates to the level the Intervener (appellee) asks."

(3) That it was the "policy of this Commission to work co-operatively with the Interstate Commerce Commission in instances where both interstate and intrastate rates are involved and discrimination is charged," and "that it would be very inconsistent on our part and improper to definitely undertake to determine what if any relief the Intervener (appellee) may be entitled to in other than some future joint proceeding heard co-operatively by the Interstate Commerce Commission and this Commission."

As regards the respective jurisdictions of the Interstate Commerce Commission and the state commission, it is settled law that the matter of establishing intrastate rates lies with the state authority, and that the Interstate Commerce Commission has authority to enter the state field and establish or authorize intrastate rates only where existing intrastate rates are found to result in unjust discrimination against interstate commerce, or to remove undue prejudice or preference against interstate commerce as between persons or localities. Florida v. United States, 282 U. S. 194, 51 S. Ct. 119, 124, 75 L. Ed. 291, decided January 5, 1931; Houston, E. & W. T. R. Co. v. United States, 234 U. S. 342, 34 S. Ct. 833, 58 L. Ed. 1341. In view of these rules of law and our finding that the interstate transit privilege on its face and as used by the carriers relates wholly to intrastate commerce, and since the 2-cent transit privilege, plus the small differential charged when the haul is more than 500 miles, are in fact but intrastate rates on iron and steel articles moving wholly intrastate as intrastate business, and have not only a statewide application, but have a particular and disparitory application and effect locally on appellee's business, it must be held that the action of the Interstate Commerce Commission establishing said interstate transit privilege is void unless same can be justified upon the grounds (a) that the existing intrastate rates on iron and steel articles are an unjust discrimination against interstate commerce; or (b) that the existing intrastate rates create an undue prejudice or preference against interstate commerce as between persons or localities. It is also settled that before exercising the authority to enter the state field and prescribe intrastate rates, the Interstate Commerce Commission must make "basic or essential findings" showing by what authority it is exercising jurisdiction in the premises. With respect to this question, the Supreme Court of the United States held in the case of Florida v. United States, supra, as follows: "The propriety of the exertion of the authority must be tested by its relation to the purpose of the grant and with suitable regard to the principle that, whenever the federal power is exerted within what would otherwise be the domain of state power, the justification of the exercise of the federal power must clearly appear. Illinois C. R. Co. v. State Pub. Utilities Commission [245 U. S. 493; 38 S. Ct. 170, 62 L. Ed. 425, P. U. R. 1918C, 279], supra. The Commission has no general authority to regulate intrastate rates, and the mere existence of a disparity between particular rates on intrastate and interstate traffic does not warrant the Commission in prescribing intrastate rates. Arkansas R. Commission v. Chicago, R. I. & P. R. Co. [274 U. S. 597, 71 L. Ed. 1224, 47 S. Ct. 724], supra."

This same authority also held as follows: "In considering the authority of the Commission to enter the state field and to change a scale of intrastate rates in the interest of the carrier's revenue, the question is that of the relation of rates to income. The raising of rates does not necessarily increase revenue. It may in particular localities reduce revenue instead of increasing it, by discouraging patronage."

We find that only excerpts of the order of the Interstate Commerce Commission in the Consolidated Southwestern Cases on hearings were introduced in this case, and none of these excerpts made basic or essential findings in support of that Commission's order establishing the transit privilege as intrastate rates with a state-wide application on the ground of an unjust discrimination against interstate commerce; nor was there shown to have been any evidence introduced as to the relation of interstate and intrastate rates to the income of the carriers as establishing an unjust discrimination against interstate commerce. So if the order in the Consolidated Cases was intended to relieve an unjust discrimination as against interstate commerce upon the ground just stated, it is void, and constituted no barrier to the Railroad Commission giving appellee the relief to which it was entitled against the use by carriers of the transit privilege. Florida v. United States, supra; Houston Chamber of Commerce v. Railroad Commission of Texas (Tex. Civ. App.) 19 S.W.(2d) 583; Railroad Com-

mission v. Galveston Chamber of Commerce, 51 Tex. Civ. App. 476, 115 S. W. 94; Railroad Commission v. Compress Co. (Tex. Civ. App.) 264 S. W. 214; Id., 114 Tex. 582, 278 S. W. 1115.

The only remaining possible jurisdiction the Interstate Commerce Commission could have had under the facts of this case was to remove an unjust discrimination as between persons and localities in relation to Interstate Commerce; the question being one of the relation of the interstate and intrastate rates to each other. The excerpts of the order of the Interstate Commerce Commission in the Consolidated Cases introduced in evidence, and which might bear upon this issue, are as follows: "We find that as a whole the class and commodity rates between points in Texas, in their relations to the corresponding class and commodity rates between St. Louis and points in Texas, have not been shown to be unduly prejudicial to St. Louis or unduly preferential of Texas receivers or shippers, * * * although in many instances, such as rates between Houston, Galveston and Beaumont, on the one hand, and northern and northeastern Texas points, on the other, the Texas intrastate rates are unduly preferential of Texas shippers and receivers and of Texas intrastate traffic and unduly prejudicial to shippers and receivers at St. Louis and other points in St. Louis territory and in other defined territories; but, in view of other findings hereinafter made, which will result in a readjustment of the Texas intrastate and St. Louis-Texas rates, and rates differentially related thereto, on bases which will bring about fair relationships between shippers in Texas and at St. Louis and in the defined territories, no attempt will here be made to specify more definitely the particular Texas rates which result in undue prejudice and preference in their relation to the rates to and from St. Louis, and the defined territories. * * * The St. Louis interests complain that there are disparities between the Texas intrastate rates and the rates from St. Louis to Texas points, resulting in undue preference to Texas interests. The rate from St. Louis to most points in Texas common-point territory is 73 cents for an average haul of about 800 miles. However, to points in the northeastern part of the State, where the hauls are considerably less, there are somewhat lower rates. The maximum rate within Texas is 48.5 cents, which applies for all distances in excess of 475 miles. Galveston and Houston are the principal points with which St. Louis competes in distributing into Texas. Their jobbers may ship all the way to Amarillo, 643 miles distant, at a rate of 48.5 cents, while St. Louis interests in shipping to Amarillo must pay 73 cents for a haul less than 200 miles greater. The Texas intrastate rates are 60 per cent. of the fifth-class rates, this basis having been prescribed in the Shreveport case. The 73-cent rate from St. Louis to Texas points is about 64 per cent. of the fifth-class rate, but the class rates from St. Louis to Texas are relatively higher than the Texas intrastate class rates."

It would seem from these findings that the only preferential intrastate rates attacked by St. Louis were those applicable to Houston and Galveston, the "principal points with which St. Louis competes in distributing into Texas," and would not justify the establishment by the Interstate Commerce Commission of the transit privilege with a state-wide application, which had the effect in this case of not only creating an unjust discrimination between appellee and competing milling plants outside of Texas, but also created an unjust discrimination as between appellee and its local competitors relating to intrastate rates and business moving wholly intrastate. In other words, as this record presents the question, the transit privilege established by the Interstate Commerce Commission with a state-wide application appears to be based upon the intervention of St. Louis complaining of unjust discrimination as between persons residing there and persons residing at Houston and Galveston, and for that reason the order is void and constituted no barrier to the Railroad Commission giving appellee the relief to which it is entitled under the evidence. The question here presented, as was the case presented in Florida v. United States, supra, which case has been reported since the submission of this case, is not merely one of authority of the Interstate Commerce Commission, but of its appropriate exercise with regard to basic or essential findings required to support that commission's order or jurisdiction. We quote from the Florida Case as follows: "The question is not merely one of the absence of elaboration or of a suitably complete statement of the grounds of the Commission's determination, to the importance of which this court has recently adverted (Beaumont, S. L. & W. R. Co. v. United States, decided November 24, 1930, 282 U. S. 74, 51 S. Ct. 1, 75 L. Ed. 221), but of the lack of the basic or essential findings required to support the Commission's order. In the absence of such findings, we are not called upon to examine the evidence in order to resolve opposing contentions as to what it shows or to spell out and state such conclusions of fact as it may permit."

With respect to the third reason given by the Railroad Commission for not granting appellee relief, and suggesting a possible relief through a joint hearing of the state and federal commissions, we find no law or procedure whereby appellee could invoke the joint jurisdiction of these commissions. The Railroad Commission might have itself obtained such joint hearing, and thereby afforded appellee the relief to which it is entitled under the facts.

The trial court found that the Interstate Commerce Commission had no authority to prescribe the 2-cent transit privilege plus differentials as intrastate rates, but did not enjoin the carriers from collecting same or from using the transit privilege and differentials as intrastate rates on traffic moving wholly within Texas as intrastate business. Appellee's pleadings with its prayer for cancellation of all rates and for general and special relief were sufficient to authorize such relief. The record as presented shows that the Interstate Commerce Commission made no basic or essential findings to support its order, or for its jurisdiction to establish or authorize the 2-cent transit privilege plus differentials as intrastate rates on iron and steel articles moving wholly within this state as intrastate business, in order to end an unjust discrimination as against intrastate commerce either as between persons and localities, or because of an undue burden upon the income of the carriers. However, only excerpts of the order of the Interstate Commerce Commission and its proceedings in the Consolidated Cases hearing are in evidence, and we reverse and remand the cause for a fuller development of the case in this regard. If it be found after a full hearing of the issue that the Interstate Commerce Commission failed to make basic or essential findings to support its order and jurisdiction for entering the state field under the rules stated by Chief Justice Hughes in the case of Florida v. United States, supra, its order establishing the 2-cent transit privilege plus differentials as intrastate rates is wholly void, and the district court may enjoin the carriers from collecting same, and from using the said transit privilege in connection with interstate rates on iron and steel articles. On the other hand, if it be shown that the Interstate Commerce Commission had lawfully entered the state field in prescribing the 2-cent transit privilege, then neither the Railroad Commission nor the state court has any jurisdiction in the premises, but exclusive jurisdiction lies with the Interstate Commerce Commission and the federal courts to grant appellee any relief.

Reversed and remanded.

### On Motions for Rehearing.

Since our decision reversing the judgment and remanding this cause, the Commission of Appeals has answered the certified question in Texas Steel Co. v. Ft. Worth & D. C. Ry. Co., 40 S.W.(2d) 78, holding that the freight rates here involved were legally filed by the railroads with the Interstate Commerce Commission; and that suits raising issues of discrimination growing out of such rates can be maintained only in federal courts, after matter has been presented to Interstate Commerce Commission. We therefore grant appellants' motions for rehearing, and set aside our former judgment remanding the cause, and reverse the judgment of the trial court and dismiss the suit.

Judgment reversed, and suit dismissed.