**STATE et al. v. LONE STAR GAS CO.**
No. 8238.

Court of Civil Appeals of Texas. Austin.
July 10, 1935.

Rehearing Denied Sept. 25, 1935.

486

Jas. V. Allred, former Atty. Gen., Elbert Hooper and Wm. C. Fitzhugh, all of Austin, Wm. McCraw, Atty. Gen., Scott Gaines and Alfred M. Scott, Asst. Attys. Gen., and F. L. Kuykendall, Chief Examiner, Gas Utilities Division, Railroad Commission of Texas, all of Austin, and A. R. Stout, former Asst. Atty. Gen., of Houston, for the State.

Karl F. Griffith, Roy C. Coffee, Marshall Newcomb, all of Dallas, Thompson & Barwise and Ogden K. Shannon, all of Fort Worth, and Ben H. Powell, of Austin, for appellee.

BLAIR, Justice.

Acting under the power conferred by article 6050 et seq., R. S. 1925, and after a hearing which continued for more than seven months, the Railroad Commission of Texas promulgated its order requiring appellee, Lone Star Gas Company, to "charge, bill and receive for domestic gas at the city gate from all distributing companies served by it, a rate not to exceed $0.32 per thousand cubic feet," in lieu of the 40-cent rate theretofore charged. Immediately appellee filed a bill of complaint in the federal District Court, seeking to restrain the enforcement of the rate order on several constitutional grounds, and particularly as being confiscatory of its property. Thereafter, the commission, Attorney General, and others, herein called commission, instituted this proceeding in the district court of Travis county, Tex., in order to bring appellee within the jurisdiction of the state court under the provisions of section 266 of the Judicial Code of the United States (28 USCA § 380). The commission asserted the validity of the order in every particular, and sought to restrain appellee from violating it. In conformity with what was regarded as proper procedure under section 266 of the Judicial Code, both the state and the federal courts temporarily restrained the enforcement of the rate order, and later the federal court ordered all proceedings therein stayed until the final disposition of this cause. Appellee's answer herein, seeking to set aside the rate and restrain its enforcement, was in effect an appeal by it under article 6059, which provides that any gas utility dissatisfied with any rate may petition a court of competent jurisdiction in Travis county and have same set aside, upon showing by clear and satisfactory evidence that such rate is unreasonable and unjust as to it. Appellee alleged that the rate order was violative of the commerce, the due process, the equal protection, and the freedom of contract clauses of the Federal Constitution (article 1, § 8, cl. 3; Amend. 14); and was confiscatory and unreasonable and unjust because it would not afford a reasonable return on the fair value of its property used in the public service. In reply, the commission asserted the validity of the order in every particular, denied that any gas moved in interstate commerce; but that if so, it was negligible in amount and was not affected by the rate; and that in absence of legislation by Congress on the subject, the commission had the authority under the statutes and in the exercise of the police power of the state to regulate and control public gas utilities, and to fix reasonable rates for gas sold and delivered to its citizens, even though interstate commerce was indirectly or incidentally affected thereby.

The trial court concluded the commerce and all constitutional questions against appellee; but the jury found in answer to the one special issue submitted that "the order for a rate not to exceed 32 cents per thou-

sand cubic feet of gas sold to the distributing companies at the gates of the points served, is unreasonable and unjust as to the Lone Star Gas Company." Judgment was accordingly rendered setting aside the 32-cent rate order, and perpetually restraining its enforcement.

The special issue submitted, with the definition and instructions given in connection therewith, was in the nature of a general charge, and required the jury to determine all questions of law and fact of the entire case. Under the pleadings of appellee, the ultimate question of fact was whether the 32-cent rate would yield a reasonable return on the fair value of the property used in the public service of delivering and selling natural gas to the distributing companies at the city gates of the various Texas cities and towns. Appellee attempted to prove that the 32-cent rate would not yield a reasonable return, for two reasons, as follows:

1. Because the 32-cent rate would not yield the minimum return of 6 per cent. declared to be reasonable by the commission; and

2. Because if so, a return of 6 per cent. was so low as to be confiscatory and unreasonable and unjust.

■ The burden was heavily upon appellee to show by clear and satisfactory evidence that the 32-cent rate would not afford a reasonable rate of return on the property used in the Texas public service. Appellee did not meet this burden and quantum of proof; and the trial court erred in overruling the commission's motions for an instructed verdict and for judgment declaring the rate to be valid. In view of this conclusion, the appeal presents two main divisions, as follows:

1. Three constitutional objections are urged against the 32-cent rate order, as follows:

(a) Interference with interstate commerce.

(b) Interference with the right to contract.

(c) Confiscation of property.

2. The legal sufficiency of the evidence adduced by appellee to show that the rate order was confiscatory or unreasonable and unjust as to it.

· The Texas statutes, particularly articles 6050, 6051, and 6053, classify the various kinds of business engaged in producing, transporting, delivering, and selling natural gas to the public for domestic or other use, and declare each to be a public gas utility, affected with the public interest and subject to the regulation and control of the commission. Gas pipe lines engaged in producing, buying, transporting, delivering, or otherwise dealing in natural gas are each declared to be a public utility, affected with the public interest, and in nature and according to the established method of conducting same a monopoly, and subject in respect to all their holdings pertaining to the gas business and in all relations to the public, and in respect to their producing, transporting, receiving, and distributing facilities, to the full and complete control and supervision of the commission. Authority is also given the commission to fix, establish, and enforce a reasonable rate which pipe lines may charge for gas delivered at the city gate to another distributing company or municipality; to fix a reasonable rate for gas sold and delivered by pipe lines or other distributing companies to the public for domestic or other use; and to fix and establish a fair and equitable division of the proceeds of the sale of natural gas between the producing or transporting companies and the companies distributing or selling it to the ultimate consumer. In the exercise of the power so conferred, the commission is authorized to act upon its own motion, or upon the petition of any person, corporation, municipality, etc., showing a substantial interest in the subject.

Accordingly, the commission of its own motion ordered a hearing to investigate the 40-cent city gate rate which appellee uniformly charged the various distributing companies throughout the state for gas. Appellee and each of the approximately 270 cities and towns served by it were given notice of the hearing, after which the commission made its order fixing the 32-cent gate rate, found to be "fair, just and reasonable," in lieu of the 40-cent rate theretofore charged, found to be "unfair, unjust and unreasonable."

### Interstate Commerce Issue.

Appellee obtains its natural gas from two states, which under its system of accounting is allocated to three sources. The first source is gas produced or purchased in Texas and transported and delivered entirely within Texas. As to this gas, appellee admits the authority of the

commission to regulate and fix the price for which it shall be sold at the city gates to the affiliated distributing companies in a proper proceeding, but contends that since the rate order in question also attempts to fix the price of gas transported in interstate commerce, the order is invalid in toto because invalid in part. From this source appellee accounts for about 79 per cent. of its total gas supply.

The second source of gas is produced or purchased by appellee in Oklahoma, and transported through its pipe lines from points of production into Texas. All of this gas is processed and treated in gasoline plants located near Gainesville, Tex.; and Petrolia, Tex. At these plants the heating value of this gas is lowered by extracting the gasoline therefrom, and practically all of it is recompressed. When this gas leaves Oklahoma for Texas its exact ultimate destination is not known, and a considerable amount of it is run through and stored in wells at the extraction plants in Texas for future use as needed. Each pipe line transporting this gas has a meter at the state line, for the purpose of measuring the amount thereof. From this source, over the 1927–1933 period considered, appellee accounts for about 4 per cent. of its total gas supply. However, the amount of this gas has shown a marked decline until during the last year of the accounting period it amounted to about one-half of 1 per cent. of appellee's total gas supply. All of this gas is commingled in storage or pipe lines with appellee's Texas gas before delivery at the city gates. Appellee contends that this gas moved in interstate commerce to the city gates, and is, therefore, not subject to the jurisdiction of the commission.

The third source of gas is produced or purchased in the Panhandle field in Wheeler county, Tex., and transported by appellee's private pipe line through a corner of Oklahoma (less the amount of deliveries at Hollis, Okl.) and back into Texas, uninterruptedly. The commission alleged and indisputably proved that this pipe line was built through a sparsely settled, rough, rocky region, just within and paralleling the boundary line of Oklahoma, for about 40 miles, recrossing the Texas line at a point on the Prairie-Dog Town Fork of Red river, where an exceedingly expensive crossing was necessary, which would not have been neces-

sary if the pipe line had been constructed by a more direct route within Texas; and that as compared to the Oklahoma route, the Texas route would have been much less expensive, through sandy and less corrosive soil, more direct, and through a more populous region. The commission contends that the construction of this pipe line was, therefore, fraudulently done for the purpose of attempting to deprive it of jurisdiction over appellee. From this source of gas appellee accounts for about 17 per cent. of the total supply subject to the rate order in question.

The gas reserve of appellee in Oklahoma as compared to those in Texas amounted to about one-fourth of 1 per cent. The gas reserves in Texas are more than sufficient to supply all Texas needs, and the gas supply of Oklahoma will likewise supply all its needs. The Texas gas used in Oklahoma and the Oklahoma gas used in Texas about strike a balance, and in any event, if the excess should be in favor of Oklahoma, it is negligible. Texas gas is less expensive to produce than Oklahoma gas. Approximately 85 per cent. of appellee's property is situated in Texas; and approximately 99 per cent. of its gas reserves are in Texas. Gas coming from Oklahoma is so mixed and commingled with Texas gas that it cannot be definitely traced by volume to any particular city gate, because it is divided and redivided into the network of appellee's pipe lines, in amounts which are negligible in comparison with the amount of the Texas gas. Oklahoma produced gas is not served south of Fort Worth or Dallas, nor west of Fort Worth. A very small amount of Oklahoma gas is delivered to independent distributors at Gainesville and Waxahachie. The order does not in any manner interfere with the sale of the Oklahoma gas at the same rate as the Texas gas.

In view of these facts, appellee contends that the order was an attempt to regulate and burden interstate commerce, because a part of the gas affected by the 32-cent rate is produced or purchased in the state of Texas, and transported by the pipe lines of appellee through a corner of the state of Oklahoma and back into Texas, where it is sold and delivered wholesale at the gates of the various Texas cities and towns; and because a part of the gas is produced or purchased in the state of Oklahoma and transported by the pipe

490

lines of appellee uninterruptedly and at high pressure into Texas, where it is sold wholesale at the city gates.

As preliminary and as bearing upon the issues of interstate commerce, the interference with the right to contract, operating expenses, and other issues relating to the jurisdiction of the commission to regulate and control appellee, it was the theory of the commission that by reason of an intercorporate set-up and affiliation between appellee and the distributing companies to which it delivered gas at the city gates, an integrated but single business enterprise was established in which appellee and the distributing companies were merely the departments or instrumentalities through which the single business enterprise sold and delivered natural gas to the ultimate consumer or burner tip user. The commission asserted that the fixing of the gas rate at the city gate under such business set-up effectually fixed the rate from the city gate to the burner tip, which was intrastate commerce and subject to the control and regulation of the commission. It was alleged that the unity or oneness of the business enterprise was accomplished by the combination of property and effort, and through a holding corporation, the Lone Star Gas Corporation, a Delaware chartered corporation, with its principal offices in Pittsburg, Pa. The facts sustaining this allegation are as follows:

Appellee, Lone Star Gas Company, is in corporate theory a Texas gas pipe line corporation, classified by article 6050 as a "public utility," and "declared to be affected with a public interest and subject to the jurisdiction, control and regulation of the Commission." By article 6051, appellee's business is declared to be "a business which in its nature and according to the established method of conducting the business is a monopoly and shall not be conducted unless * * * such business be subject to the jurisdiction herein conferred upon the Commission." In excess of 99 per cent. of appellee's common, voting, or controlling stock is owned by the Lone Star Gas Corporation, the Delaware chartered corporation, which does not have a permit to do business in Texas.

The affiliated distributing companies material to this case are the Community Natural Gas Company, County Gas Company, Dallas Gas Company, Municipal Gas Company, and Texas Cities Gas Company. Each of these companies is a Texas corporation, and in corporate theory and as classified by article 6050, each is a "public utility," engaged in distributing or selling natural gas to the public for domestic or other use, serving one or more of some 270 cities and towns in Texas. The Delaware holding corporation owns in excess of 99 per cent. of the common or voting stock of the affiliated Community Gas Company, County Gas Company, Municipal Gas Company, Texas Cities Gas Company, and, through a subholding corporation, the Dallas Gas Company.

Appellee and all of its affiliated distributing companies have connected offices in Dallas, Tex., and all of these Texas corporations and the Delaware holding corporation have officers and directors common to each corporation, although there is not a majority by number in any instance. Voting by proxy or as attorney in fact is practiced by the interlocking directors and officials of all corporations involved in the intercorporate set-up. All Texas corporations confer with and are subject to the management of the Lone Star Gas Corporation, the holding corporation. For these services it exacts a "management fee" of 1 per cent. of the gross annual revenue of appellee, and a "management fee" is also exacted by the holding corporation from each affiliated distributing company. The holding corporation has loaned appellee $17,600,000 on its unsecured note; and loans have been made to each affiliated distributing company either on open account or on unsecured notes. Interest at 6 per cent. is charged on the $17,600,000 indebtedness of appellee, although the holding corporation borrowed the money at 5 per cent., and a similar condition exists as to the affiliated distributing companies, notwithstanding some of them are able to borrow large sums from local banks at from 4 to 4½ per cent. interest.

All books of all corporations, except the holding corporation, are kept in the offices at Dallas, Tex., and a general or supervising auditor has authority and direction over all books. Accounting services, engineering, financing, purchasing. and operating supervision are furnished all Texas corporations by the Delaware holding corporation, and a general counsel represents all the corporations involved in the intercorporate set-up.

In its department of the integrated business enterprise, appellee is engaged in producing and purchasing natural gas and in transporting same by its 4,000-mile pipe line system from the point of production to the city gates of some 270 cities and towns in Texas, where the gas is delivered to one and the other affiliated distributing companies. A uniform rate of 40 cents at the city gate is made by appellee, which rate it filed with the commission, and has charged and collected for several years. Appellee has long-term contracts with its affiliated distributing companies for the 40-cent city gate rate.

In their department of the integrated business enterprise, the affiliated distributing companies are engaged in selling and delivering the gas to the burner tips of the consumers, and for which service they charge a fixed rate.

Appellee also furnishes gas at the city gates of Waxahachie and Gainesville, Tex., to two independent distributing companies—the Waxahachie Gas Company and the Gainesville Gas & Electrical Company; and in Waxahachie, a small amount to its affiliated Municipal Gas Company. The amount of this gas is negligible, in comparison with appellee's total gas business. Each independent distributing company pays the 40-cent city gate rate under long-term contracts with appellee.

The cases are legion which deal with the relationship of two or more corporations from the standpoint of ownership of the capital stock in one by another, and from the standpoint of association together for the purpose of carrying on a single or common business enterprise. The rule is well settled that courts will look through the forms to the realities of the relationship between two or more corporations in order to determine whether each is a separate entity or corporation; or whether their commingled affairs are such as to constitute them one integrated and single business enterprise; or whether, through intercorporate set-up, affiliation, or stock ownership, the purpose is to control the subsidiary corporation or corporations so that they are used as the mere instrumentalities or agents of the owning corporation or corporations. In discussing the rule, it has been held that while "ownership, alone, of capital stock in one corporation by another, does not create an identity of corporate interest * * * or create the relation of principal and agent or representative between the two"; still it has been repeatedly held that such rule is not applicable "where stock ownership has been resorted to, not for the purpose of participating in the affairs of a corporation in the normal and usual manner, but for the purpose * * * of controlling a subsidiary company so that it may be used as a mere agency or instrumentality of the owning company or companies." Chicago, M. & St. P. Ry. v. Minneapolis Civic & Commerce Ass'n, 247 U. S. 490, 38 S. Ct. 553, 557, 62 L. Ed. 1229; United States v. Lehigh Valley R. R. Co., 220 U. S. 257, 31 S. Ct. 387, 55 L. Ed. 458; United States v. Reading Co., 253 U. S. 26, 40 S. Ct. 425, 64 L. Ed. 760; United States v. Delaware, L. & W. R. Co., 238 U. S. 516, 35 S. Ct. 873, 59 L. Ed. 1438. Also, in discussing the rule, the fact that the same persons are directors and managers of two corporations has been given consideration (McCaskill Co. v. United States, 216 U. S. 504, 30 S. Ct. 386, 391, 54 L. Ed. 590), and "a growing tendency is therefore exhibited in the courts to look beyond the corporate form to the purpose of it, and to the officers who are identified with that purpose." See, also, Gallatin Natural Gas Co. v. Public Service Co., 79 Mont. 269, 256 P. 373. Where one corporation owns or dominates another, it has been often held that "the independent entity of the two companies is so far disregarded that each is considered as but a part of the indivisible whole." Kimberly Coal Co. v. Douglas (C. C. A.) 45 F.(2d) 25, 27; In re Kentucky Wagon Mfg. Co. (D. C.) 3 F. Supp. 958; Law v. McLaughlin (D. C.) 2 F. Supp. 601. And "the rule which appears to be established by these cases is that, where the corporate organization and affairs of one railroad company are controlled and dominated by another railroad company through ownership of stock or lease, the roads must be regarded as identical for the purpose of rate making." Pontiac, O. & N. Ry. Co. v. Michigan R. R. Com., 203 Mich. 258, 168 N. W. 927, 929.

A somewhat analogous question was decided by this court in A., T. & S. F. Ry. Co. v. R. R. Com., 77 S.W.(2d) 773, 775 (writ refused), wherein it was held that subsidiary corporations, owned, controlled, and operated by railroads to carry on pickup and delivery service, did not possess separate legal individuality from the parent corporations, as regards the jurisdic-

tion of the Railroad Commission; and wherein it was held as follows: "To permit railroads to perform such steps in the process of transportation through other separate legal entities created and owned by them would enable them to defeat the jurisdiction of the commission over ·such transportation. And in such case where the stock of such separate corporation is owned by the railroad company, and its sole function is merely to help conduct the business of the parent corporation under whose complete control it operates, and in the instant case largely, if not wholly, through .the same employees, the subsidiary corporation will be treated as if it were a mere department of the railroad itself."

When viewed in the light of the facts and the aforesaid rule, it becomes apparent that appellee and its affiliated distributing companies were engaged in an integrated but single business enterprise of producing, purchasing, transporting, delivering, and selling natural gas for domestic or other use to the ultimate consumer. This was accomplished by combination of property and effort, and through ownership of more than 99 per cent. of the capital stock of appellee and all affiliated distributing companies by the holding corporation. All corporations are under the common management of the holding corporation, for which service it is paid management fees. The Texas corporations and the holding corporation have officers and directors common to each, who actually manage, supervise, and control the entire business enterprise through the intercorporate set-up. By permitting or organizing such intercorporate set-up, the Texas corporations have, considering their entire operations .as a whole, created a single and integrated business enterprise, and with respect to the jurisdiction of the commission, to regulate and control such business, and particularly for the purpose of fixing the rates for which it might sell gas to the public in Texas, the corporation must be re-garded as being engaged in the ` single business enterprise of producing, purchasing, transporting, delivering, and selling natural gas to the ultimate consumer or user in Texas. The fact that separate corporate entities were formed which represent different departments of the integrated but single business enterprise does not affect the question, because the

court must look beyond the corporate form to the purpose of the unified organization, and to the officials who are identified with that purpose. To otherwise hold, and to permit the Texas corporations to so dispose of their capital stock and to so form a separate entity of their own, and to surrender the 'management and control of their business to the holding corporation, which has no permit to do business in Texas, would enable them to defeat the jurisdiction of the commission over them as Texas public utilities, for which purpose the state of Texas granted them life and the privilege of doing business.

The fact that appellee and the affiliated distributing companies may be engaged in the integrated but single business enterprise of producing, purchasing, transporting, and selling natural gas to the ultimate consumer or burner tip user is not of controlling importance on the commerce issue; because the commission did not fix the burner tip rate, nor did it require the distributing companies to pay appellee not in excess of the 32-cent city gate rate, and to pass the 8-cent reduction on to the ultimate consumer or burner tip user. ·

Just why the commission fixed the 32-cent city gate rate for gas without also requiring the distributing companies to pay not in excess of such rate, and to pass the 8-cent reduction on to the ultimate consumer or burner tip user, is not clear from the order or record. It is conceded that the business of distributing gas from the city gate to the burner tip user was intrastate commerce over which the commission had jurisdiction; and that it could have, after a hearing at which the reasonableness of the city gate rate charged by appellee for gas was inquired into, required the various distributing companies to pay appellee at each city gate a rate not in excess of the 32-cent rate, even though the gas sold and delivered by appellee moved in interstate commerce to the city gate. Article 1119, R. S. 1925, authorizes cities and towns of over 2,000 population to fix local rates for gas sold by a public utility. Texas-Louisiana Power Co. v. City. of Farmersville (Tex. Com. App.) 67 S.W.(2d) 235. The commission is authorized to originate rates for cities and towns of less than 2,000 population; and article 6053 authorizes

it to fix city gate and other rates for natural gas for all cities and towns without regard to population. The order recited that there were then pending some 125 appeals from rates fixed by cities and towns under the provisions of articles 1119 and 6058, and that there were also pending before the commission numerous cases in which the rates to be reviewed or fixed necessarily involved the determination of the reasonableness of the city gate rate charged the distributing companies by appellee, as a step preliminary to the disposition of such appeals and cases, and in order to determine or fix reasonable local or burner tip rates therein. All of these cities and towns were given notice of the hearing before the commission. It would seem from these recitations of facts and circumstances that the commission consolidated all the appeals and cases pending before it in which the determination of the city gate rate charged by appellee for gas was necessarily involved as a step preliminary to reviewing or fixing the local or burner tip rates for gas. The wisdom of the method of procedure adopted cannot be successfully attacked. A separate hearing in the case of each city or town would have presented an insurmountable task; and if the expenses of this hearing are a criterion, no city or town could bear such expense. Separate hearings would not afford appellee any relief to which it is not entitled to receive here. Nor is it "essential that the commission dispose of a matter pending before it in a single order, but that it may in a proper case make a preliminary disposition of the matter, and reserve for further consideration, and dispose of by subsequent order, other questions or issues involved in the main issue without further notice or hearing." Houston Chamber of Commerce v. R. R. Comm. (Tex. Civ. App.) 19 S.W.(2d) 583, 586, affirmed (Tex. Com. App.) 78 S.W.(2d) 591; Magnolia Pet. Co. v. Edgar (Tex. Civ. App.) 62 S.W.(2d) 359 (writ ref.). Moreover, all parties have by court proceedings and otherwise treated the order as a final order fixing the 32-cent city gate rate. Certainly appellee has so treated the order, and if declared valid herein, appellee has no further interest in any order the commission may make with regard to requiring the various distributing companies to pay not in excess of the 32-cent city

gate rate, and to pass the 8-cent reduction on to the ultimate consumer or burner tip user. Furthermore, in its department of the intercorporate set-up and affiliation appellee was a gas pipe line utility, engaged in the integrated business of producing, purchasing, transporting by pipe line, and selling natural gas to the distributing companies at the city gates of some 300 cities and towns in Texas and Oklahoma. Appellee's charter and the books kept under the direction of the auditor of the intercorporate business set-up established that it was so engaged. On the hearing before the commission, all parties proceeded upon the theory that appellee was so engaged. It had contracts with the affiliated as well as the two independent distributing companies for the 40-cent city gate rate uniformly charged throughout the state of Texas by appellee. The Texas statutes authorize the commission to fix reasonable city gate as well as local or burner tip rates for gas, and appellee states in its brief that "the Railroad Commission of Texas has power and authority to fix and prescribe the charges which defendant may make for gas produced or purchased by it and moving throughout its entire transit, up to the point of delivery at the city gates, wholly within the State of Texas, subject to defendant's rights under the Fourteenth Amendment of the Constitution of the United States, and the Bill of Rights of the Texas Constitution; and it has power and authority to determine the rates and charges to be received for the sale of gas to domestic customers in towns and cities in Texas (i. e. local rates), even though a part of the gas so sold has moved continuously in interstate commerce from the points of origin to the points of delivery at the city gates, subject to a similar qualification. But it may not regulate the gate rate to be charged by defendant for the sale of interstate gas." In view of these facts, admissions, and proceedings, we will consider the rate order in question as a final appealable order, and pass to a further consideration of the interstate commerce issue.

Whether the conduct of appellee, in constructing and transporting by its private pipe line gas from the Texas Panhandle field through Oklahoma and back into Texas, where it is intended at all times to be delivered, sold, and used,

494

constitutes a fraudulent attempt to make such gas move in interstate commerce, and thereby deprive the commission of the power to regulate the price for which it may be sold, does not appear to be material, because such transportation of the gas is not interstate commerce as a matter of fact. Except for the right to authorize the construction of the pipe line within its boundary, the state of Oklahoma has no concern whatever with the transaction. Only one town, Hollis, in Oklahoma, is served by the pipe line. It could have been as well served by a direct pipe line from Texas to it, and such service is in no manner affected by the rate order in suit. The mere fact that such town is served with gas delivered from the pipe line does not stop, hinder, affect, or in any manner interrupt or interfere with the continuous flow of the gas from Texas through Oklahoma and back into Texas, where it is intended at all times to be delivered, sold, and used.

In 1 Supreme Court Law, 347, the following rule is stated: "Interstate commerce is a practical conception drawn from the course of business upon a broad consideration of the substance of the whole transaction. Substance and not form controls. The actual fact, not technical considerations, governs."

The text cites many cases supporting the rule, holding in substance that what is or is not interstate commerce is to be determined upon broad consideration of the substance of the whole transaction. See Federal Trade Com. v. Pacific, etc., Ass'n, 273 U. S. 52, 47 S. Ct. 255, 71 L. Ed. 534; Eureka Pipeline Co. v. Hallanan, 257 U. S. 265, 42 S. Ct. 101, 66 L. Ed. 227; Swift & Co. v. United States, 196 U. S. 375, 398, 25 S. Ct. 276, 49 L. Ed. 518; Dozier v. State, 218 U. S. 124, 30 S. Ct. 649, 54 L. Ed. 965, 28 L. R. A. (N. S.) 264.

■ Cases cited by appellee and many others hold that gas produced in one state and transported by pipe line to another state for sale and use is interstate commerce. 1 Supreme Court Law, 367. But no case is cited and none is found by us which would support a holding that the transportation by its private pipe line of gas produced or purchased by appellee in Texas through a corner of Oklahoma and back into Texas, uninterrupt-ed, and with the intention at all times that such gas would be delivered, sold, and used in Texas, is interstate commerce. Appellee is a Texas public gas utility corporation. Its primary duty is to serve Texas citizens with gas produced from Texas soil. Its corporate life and being was granted in consideration of these premises. With this in view, but one practical conception can be drawn from the whole transaction involved, that is, the gas produced in Texas and intended to be delivered, sold, and used in Texas is intrastate commerce. The mere fact that appellee has selected a route through Oklahoma as an aid to the transaction of its Texas business cannot work a change in the nature of the business, nor does it affect the character of the business. The transportation of gas through Oklahoma is merely a method of delivery and is a negligible circumstance in determining the interstate commerce issue. Heyman v. Hays, 236 U. S. 178, 35 S. Ct. 403, 59 L. Ed. 527.

■ If, however, the delivery of the gas by appellee from Texas through Oklahoma and back into Texas, intended at all times for Texas consumption, be regarded as interstate commerce, such transaction only affects transportation of the gas and as to which only appellee and the Texas consumers are interested. The Interstate Commerce Act, as now amended, expressly excepts from the jurisdiction of the Interstate Commerce Commission the regulation of interstate transportation of "natural or artificial gas, by pipe line, or partly by pipe line and partly by railroad or by water." USCA, title 49, chap. 1, § 1, subd. (1) (b). And since the regulation of the transportation of gas is expressly excluded from the scope of the interstate commerce statute, it is within the police power of the state to fix reasonable rates for which gas may be sold to its citizens, even though such rates may indirectly or incidentally affect the interstate transportation of such gas, or may so affect interstate commerce in the same. Simpson v. Shepard, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; West v. Kansas Natural Gas Co., 221 U. S. 229, 31 S. Ct. 564, 55 L. Ed. 716, 35 L. R. A. (N. S.) 1193; Pennsylvania Gas Co. v. Public Service Com., 252 U. S. 23, 40 S.

Ct. 279, 64 L. Ed. 434; Manufacturers' Light & Heat Co. v. Ott (D. C.) 215 F. 940, 944, 945.

■ Neither the Texas statutes nor the rate order interfere in any manner with the transportation of gas from Texas through Oklahoma and back into Texas. The order only attempts to regulate and fix the price for which such gas may be sold in Texas by appellee to its various distributing companies. Manifestly, this circuitous route of delivery of gas through Oklahoma cannot and does not affect the exercise of the police power of Texas to make or fix reasonable rates for such gas sold to its citizens.

Appellee contends, however, that there can be no question but that the gas produced or purchased by it in Oklahoma and transported to and sold in Texas is gas moving in interstate commerce up to the time it reaches the city gates of delivery; and that the fact that the amount of this gas is small does not affect its interstate commerce character, nor its interstate transportation. We do not sustain the contention.

The facts show that the gas produced or purchased by appellee in Oklahoma and transported by its pipe lines to Texas does not move in interstate commerce when it reaches the city gates of delivery. All gas coming from Oklahoma is run through extraction plants in Texas, where the heavier hydrocarbons and volatile gasoline are extracted, leaving the residue gas changed in its composition, and with its heating value lowered and changed. Large amounts of it are run through and stored in wells on the Miller farm near the extraction plant in Texas, continuously, and for use later as needed. The Oklahoma gas has no particular Texas city gate destination, but it is first transported to the extraction plants, and after its composition is changed, it is passed into the pipe line system of appellee, mixed and commingled with Texas gas, divided and redivided in the pipe line system until it is impossible to trace or identify it by volume at any city gate of delivery. At various points before delivery its pressure is reduced and the gas allowed to expand. The amount of Oklahoma gas as a whole is small and as divided and redivided before delivery to the various city gates, its amount is negligible in comparison with the amount of the Texas gas with which it is mixed or commingled.

Doubt has been expressed by several courts as to whether gas produced in several states and commingled in pipe lines from which it is sold is interstate commerce. This conclusion seems to have been reached on the "original package" doctrine, the courts holding that after the bulk of the imported gas is broken up for indiscriminate distribution to individual purchasers at retail sale, the interstate commerce is at an end. Contrary conclusions seem to have been reached where merely transmission for immediate or practically immediate use, direct from the seller to the consumer, is involved. But a different question arises where the gas transmitted from one state is stored and then distributed as its needs might afterwards develop; and where, as in this case, the composition of the gas is and must be changed by extracting hydrocarbons and volatile gasoline before it is ready for delivery and use by the consumer. As to such transmission of gas, the "original package" theory or doctrine is applicable and should be invoked, even though the transporting company, as did appellee and the affiliated distributing companies through stock ownership and intercorporate set-up, actually sells the Oklahoma produced gas as changed to the ultimate consumers in Texas. These questions have been either passed upon or anticipated and discussed in the following cases: Pennsylvania Gas Co. v. Public Service Comm., 252 U. S. 23, 40 S. Ct. 279, 64 L. Ed. 434; Id., 225 N. Y. 397, 399, 122 N. E. 260; West v. Kansas Natural Gas Co., 221 U. S. 229, 31 S. Ct. 564, 55 L. Ed. 716, 35 L. R. A. (N. S.) 1193; Public Utilities Comm. v. Landon, 249 U. S. 236, 39 S. Ct. 268, 63 L. Ed. 577; Id., 249 U. S. 590, 39 S. Ct. 389, 63 L. Ed. 791; State v. Flannelly, 96 Kan. 372, 152 P. 22; West Virginia, etc., Co. v. Towers, 134 Md. 137, 106 A. 265.

■ In other cases it has been held that in the exercise of the police power of the state, the state commission has authority to fix the local burner tip rates, even though the gas moved in interstate commerce to the city gate, and particularly so where, as in the instant case, an affiliation exists between the transporting and the distributing companies. Thus the state commission may validly, by the indirect process of prescribing reasonable rates for local dis-

tributing companies, control and fix the city gate rate for gas moved in interstate commerce.

 The commission did not expressly require the distributing companies to pay not in excess of the 32-cent city gate rate, but since this hearing was necessary as a preliminary step to the disposition of the appeals and cases pending, it was not essential that the commission dispose of the matter before it in a single order; but it may, if the rate herein complained of be held not confiscatory nor unreasonable and unjust, subsequently make its order requiring the distributing companies to pay not in excess of such rate, without further notice or hearing. Houston Chamber of Commerce v. R. R. Comm., supra. Manifestly, if the 32-cent rate is declared valid herein, appellee can have no further interest in any order the commission may make with regard to requiring the various distributing companies to pay not in excess of such rate, and to pass the 8-cent reduction on to the ultimate consumer. Missouri v. Kansas Natural Gas Co., 265 U. S. 298, 44 S. Ct. 544, 68 L. Ed. 1027; Public Utilities Comm. v. Landon, supra; East Ohio Gas Co. v. Tax Com., 283 U. S., 465, 51 S. Ct. 499, 75 L. Ed. 1171; Pennsylvania Gas Co. v. Public Service Comm., supra; State Corp. Comm. v. Wichita Gas Co., 290 U. S. 561, 54 S. Ct. 321, 78 L. Ed. 500; Dayton P. & L. Co. v. Public Utilities Comm., 292 U. S. 290, 54 S. Ct. 647, 78 L. Ed. 1267; Gallatin Natural Gas Co. v. Public Service Comm., 79 Mont. 269, 256 P. 373.

 Final decision, however, in most cases is rested upon the principle that the state may regulate interstate commerce of the character of natural gas in the absence of action by Congress. As hereinabove stated, the Interstate Commerce Act expressly excludes from the scope of the interstate commerce statute the transportation of natural gas. The amount of the rate or price to be charged for gas is primarily for the determination of the state in which the gas is consumed, and it is within the police power of the state to make or fix reasonable rates for gas furnished by a public utility to its citizens. Where the rates are reasonable and are fixed according to some uniform, fair, and practical standard, they constitute no burden on interstate commerce. So, if the delivery of the gas by appellee from Texas through Oklahoma and back into Texas, intended at all times for Texas consumption, and if the production and transportation of the small amount of gas from Oklahoma to Texas, where it is sold, be regarded as interstate commerce, still appellee's business is predominately a Texas business; and it is within the police power of the state to fix reasonable rates for which gas may be sold to its citizens, even though such rates may indirectly or incidentally affect the interstate transportation of such gas, or may so affect interstate commerce in the same. Simpson v. Shepard, 230 U. S. 352, 33 S. Ct. 729, 741, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18, wherein it is held as follows: "Where the subject is peculiarly one of local concern, and from its nature belongs to the class with which the state appropriately deals in making reasonable provision for local needs, it cannot be regarded as left to the unrestrained will of individuals because Congress has not acted, although it may have such a relation to interstate commerce as to be within the reach of the Federal power."

This doctrine has been carefully restated in the recent case of A. L. A. Schechter Poultry Corp. v. United States, 55 S. Ct. 837, 850, 79 L. Ed. 1570, 97 A. L. R. 947, as follows: "But where the effect of intrastate transactions upon interstate commerce is merely indirect, such transactions remain within the domain of state power. If the commerce clause were construed to reach all enterprises and transactions which could be said to have an indirect effect upon interstate commerce, the federal authority would embrace practically all the activities of the people, and the authority of the state over its domestic concerns would exist only by sufferance of the federal government. Indeed, on such a theory, even the development of the state's commercial facilities would be subject to federal control. As we said in Simpson v. Shepard (Minnesota Rate Case), 230 U. S. 352, 410, 33 S. Ct. 729, 745, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18: 'In the intimacy of commercial relations, much that is done in the superintendence of local matters may have an indirect bearing upon interstate commerce. The development of local resources and the extension of local facilities may have a very important effect upon communities less favored, and to an appreciable degree alter the course of trade. The freedom of local trade may stimulate interstate commerce, while restrictive measures within the police power of the state, enacted exclusively with respect to internal business,

as distinguished from interstate traffic, may in their reflex or indirect influence diminish the latter and reduce the volume of articles transported into or out of the state.' See, also, Kidd v. Pearson, 128 U. S. 1, 21, 9 S. Ct. 6, 32 L. Ed. 346; Heisler v. Thomas Colliery Co., 260 U. S. 245, 259, 260, 43 S. Ct. 83, 67 L. Ed. 237."

It has also been held that, "if it be assumed that interstate commerce will be incidentally affected, yet the regulation of the local charges of a natural gas company as a public service ,corporation is within the police power of the state until the Congress sees fit to act." Manufacturers' Light & Heat Co. v. Ott, supra. And certainly the state's regulatory power is not denied where it does not interfere with or burden the free interstate flow of gas. People's Natural Gas Co. v. Public Service Com., 270 U. S. 550, 46 S. Ct. 371, 70 L. Ed. 726. The rate order in this suit does not in any manner interfere, restrain, or burden the free transportation of gas between Texas and Oklahoma. Oklahoma gas may be . freely transported to Texas and sold in the open market at the same reasonable rate fixed for Texas gas. We therefore conclude that, absent legislation by Congress, and since the Interstate Commerce Act as now amended expressly excepted the regulation of transportation of "natural or artificial gas by pipe lines" from the jurisdiction of the Interstate Commerce Commission, the state commission, in the exercise of the police power of the state to regulate and control public gas utilities, had the power to fix reasonable rates for gas delivered by appellee to distributing companies at the city gate, although interstate commerce may be indirectly or incidentally affected thereby.

We further conclude that since the amount of gas produced or purchased by appellee ·in Oklahoma and transported to and sold in Texas is negligible, and, if interstate commerce, the 32-cent rate fixed by the commission in no manner interfered with, impeded, or burdened the flow of gas from Oklahoma, but such gas may be sold in competition with Texas gas and at the same reasonable price fixed by the commission.

### Freedom of Contract Issue.

The contracts of appellee with the distributing companies for the 40-cent city gate rate were made in the light of the Constitution and laws, and of the jurisdiction of the commission to regulate such rates. The order changing such rate is therefore not violative of the freedom of contract, or impairment of obligation clauses of either the State or Federal Constitutions (Const. Tex. art. 1, §§ 16, 19; Const. U. S. art. 1, § 10, cl. 1; Amend. 14).

The right of the state to regulate the rates and practices of a public utility is referable to the police power of the state, and is a legislative function which cannot be alienated or contracted away by the state or any agency or political subdivision of the state. The Constitution and laws of a state are a part and parcel of the terms of a corporate franchise, and the right of the state in the exercise of its police power to change franchise or contract rates in the protection of the inalienable rights and general welfare of its citizens is settled. Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77; Milwaukee Electric Ry., etc., Co. v. R. R. Com., 153 Wis. 592, 142 N. W. 491, L. R. A. 1915F, 744, Ann. Cas. 1915A, 911, affirmed in Id., 238 U. S. 174, 35 S. Ct. 820, 59 L. Ed. 1254; State v. Pub. Serv. Comm., 275 Mo. 201, 204 S. W. 497. The one exception to the rule is with regard to ordinances or contracts fixing rates for a limited period of time. Southern Iowa Electric Co. v. Chariton, 255 U. S. 539, 41 S. Ct. 400, 65 L. Ed. 764. Appellee's contracts are all for long periods of time, and do not come within the exception. And where, as in the instant case, there is an intimate alliance between the buyer and seller, and they are not dealing at arm's, length because of intercorporate affiliation and transactions, the prices they fix are of no concern to the public, unless they are not within the bounds of reason. Houston v. Southwestern Bell Tel. Co., 259 U. S. 318, 323, 42 S. Ct. 486, 66 L. Ed. 961; Missouri ex rel. Southwestern Bell Tel. Co. v. Public Service Com., 262 U. S. 276, 288, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807; United Fuel Gas Co. v. Railroad Com. of Kentucky, 278 U. S. 300, 320, 49 S. Ct. 150, 156, 73 L. Ed. 390, citing and quoting from Chicago & Grand Trunk Railway v. Wellman, 143 U. S. 339, 345, 12 S. Ct. 400, 36 L. Ed. 176, with approval; Smith v. Illinois Bell Tel. Co., 282 U. S. 133, 51 S. Ct. 65, 75 L. Ed. 255; Western Distributing Co. v. Public Service Comm. of Kansas, 285 U. S. 119, 52 S. Ct. 283, 76 L. Ed. 655; Dayton Power & Light Co. v. Public Utility Comm., 292 U. S. 290, 54 S. Ct. 647, 650, 78 L. Ed. 1267.

498

## Confiscation of Property.

The constitutionality of a rate depends upon whether it will yield a fair return for the present and immediate future, on the value of the property used in the public service. In absence of an actual test under a new rate, the question of whether it will afford a reasonable return is one of fact. The burden rests heavily upon one seeking to set aside a state-made rate to plead and prove the invalidating facts. Aetna Ins. Co. v. Hyde, 275 U. S. 440, 48 S. Ct. 174, 72 L. Ed. 357; Beaumont, S. L. & W. Ry. Co. v. United States, 282 U. S. 74, 51 S. Ct. 1, 75 L. Ed. 221; Brush Electric Co. v. Galveston, 262 U. S. 443, 43 S. Ct. 606, 47 L. Ed. 1076. Appellee failed as a matter of law to plead and prove any invalidating fact as to the rate in suit; to which question we now pass.

### Legal Sufficiency of Evidence to Show Rate Confiscatory or Unreasonable and Unjust.

The remaining question concerns the legal sufficiency of the evidence adduced by appellee to show that the 32-cent city gate rate was confiscatory and unreasonable and unjust. The rate was alleged to be so because it would not afford a reasonable return on the fair value of the property used in the public service of delivering gas to the various city gates, and amounted to taking the property without just compensation or due process of law, in violation of the Fourteenth Amendment to the Federal Constitution. When viewed in the light of the presumption in favor of the validity of the rate order, and the quantum and character of the evidence required to overcome such presumption, the evidence adduced by appellee was clearly insufficient to show the rate confiscatory or unreasonable and unjust on the ground alleged.

The rate fixed by the commission is presumed to be valid, reasonable, and just until it is declared otherwise by a court of competent jurisdiction. R. R. Com. v. Uvalde Construction Co. (Tex. Civ. App.) 49 S.W.(2d) 1113. In order to overcome this presumption in favor of the validity of the rate on the constitutional ground of confiscation, the burden of proof rests heavily upon appellee. Dayton P. & L. Co. v. Pub. Utilities Comm., 292 U. S. 290, 54 S. Ct. 647, 78 L. Ed. 1267. And in order to set aside the rate as being unreasonable and unjust, article 6059 requires that appellee show by clear and satisfactory evidence that such rate is unreasonable and unjust as to it. A controversy immediately arises as to the proper interpretation to be given these rules and statutory requirements as to the burden and quantum of proof. The commission contends that the rate must be sustained against the attack that it is confiscatory and unreasonable and unjust, because it does not allow a reasonable return on the fair value of the property, when it is shown to be based upon substantial evidence adduced before the commission, and that only the evidence adduced before the commission on the rate hearing may be considered on appeal to the court. On the other hand, appellee contends that the hearing on appeal to the court of such issues is de novo, and that "due process of law requires submission to a judicial tribunal for determination upon its own independent judgment as to both law and facts, according to the settled rules governing judicial action and decision." Otis Elevator Co. v. Indus. Comm., 302 Ill. 90, 134 N. E. 19, 21; Ohio Valley Water Co. v. Ben Avon Borough, 253 U. S. 287, 40 S. Ct. 527, 64 L. Ed. 908; Reagan v. Farmers' Loan & Trust Co., 154 U. S. 363, 14 S. Ct. 1047, 38 L. Ed. 1014. As regards the rate-making power of the commission, the Texas courts have adopted this wider scope of review. R. R. Comm. v. H. & T. C. R. R. Co., 90 Tex. 340, 352, 38 S. W. 750; R. R. Comm. v. Weld & Neville, 96 Tex. 394, 403, 73 S. W. 529; Gulf, C. & S. F. Ry. Co. v. R. R. Com., 102 Tex. 338, 113 S. W. 741, 116 S. W. 795; R. R. Com. v. San Antonio Compress Co. (Tex. Civ. App.) 264 S. W. 214 (writ refused Id., 114 Tex. 582, 278 S. W. 1115); Houston Chamber of Commerce v. R. R. Comm. (Tex. Civ. App.) 19 S.W. (2d) 583, affirmed (Tex. Com. App.) 78 S. W.(2d) 591, and Missouri-Kansas & T. Ry. Co. v. R. R. Com. (Tex. Civ. App.) 3 S.W. (2d) 489, 494, affirmed Producers' Ref. Co. v. Missouri, K. & T. R. Co. (Tex. Com. App.) 13 S.W.(2d) 679, wherein this court said: "Rate making is essentially a legislative function, and operates prospectively. Railroad Com. v. Weld & Neville, above; Prentis v. Atlantic Coast Line Co., 211 U. S. [210], 226, 29 S. Ct. 67, 53 L. Ed. [150], 158, 159, and authorities there cited. And the same is true of many rules and regulations within the delegated powers of the commission. Rate making has been delegated to the Railroad Commission alone, and its acts in that regard have the force and effect of statutes, and are subject to

review to the extent only that statutes of the same import are so subject, with the additional power which articles 6657 and 6658 confer upon the courts to determine whether a rate, etc., is unreasonable or unjust to the party complaining.

The case of Crowell v. Benson, 285 U. S. 22, 52 S. Ct. 285, 296, 76 L. Ed. 598, in determining the scope of review and whether new evidence will be heard on appeal from a state commission's rate order, held as follows:

"In cases brought to enforce constitutional rights, the judicial power of the United States necessarily extends to the independent determination of all questions, both of fact and law, necessary to the performance of that supreme function. The case of confiscation is illustrative, the ultimate conclusion almost invariably depending upon the decisions of questions of fact. This court has held the owner to be entitled to 'a fair opportunity for submitting that issue to a judicial tribunal for determination upon its own independent judgment as to both law and facts. * * *

"Assuming that the federal court may determine for itself the existence of these fundamental or jurisdictional facts, we come to the question, Upon what record is the determination to be made? There is no provision of the statute which seeks to confine the court in such a case to the record before the deputy commissioner or to the evidence which he has taken. * * *

"We think that the essential independence of the exercise of the judicial power of the United States, in the enforcement of constitutional rights requires that the federal court should determine such an issue upon its own record and the facts elicited before it."

See, also, State Corp. Com. v. Wichita Gas Co., 290 U. S. 561, 54 S. Ct. 321, 78 L. Ed. 500; Lehigh Valley R. Co. v. Com'rs, 278 U. S. 24, 49 S. Ct. 69, 73 L. Ed. 161, 62 A. L. R. 805; Prendergast v. N. Y. Tel. Co., 262 U. S. 43, 43 S. Ct. 466, 67 L. Ed. 853.

As regards the statutory appeal authorized by article 6059, to determine whether a rate order is unreasonable and unjust, it is manifest that the Legislature intended for the trial on appeal to be de novo and upon new or additional evidence pertinent to the issue, because the complainant is required to show by clear and satisfactory evidence that such rate is unreasonable and unjust as to it. Similar statutes regarding railroad rates have been so construed by the above-cited Texas cases, and in other states. The scope of judicial appellate review of orders of administrative boards or commissions is usually controlled by legislative enactment. This may be either by a hearing de novo or it may mean merely the correction of nonpermissible error. Freund on Administrative Powers over Persons and Property, 278. Statutes which authorize appeals from matters of purely administrative decision or discretion are usually construed to authorize only the correction of nonpermissible error, or to favor the merely corrective scope of review. Illustrative of these matters is the question of issuing a license, or the granting of a permit, or determining whether a public necessity or convenience exists for bus or truck operation. In such cases the Legislature does not vest in courts the administrative function of determining whether a license, permit, or certificate of convenience or necessity should issue, but merely gives the courts authority to determine whether the action of the administrative board or commission is (a) beyond the power it could constitutionally exercise, or (b) beyond its statutory power, or (c) based upon substantial evidence.

As to such administrative matters, the legal effect of the findings of fact by the administrative body approximates a question of law, and a finding without evidence is, of course, beyond the power of the administrative body. Nor will courts in such cases review conclusions of the administrative body based upon conflicting evidence; but will sustain its order if based upon substantial evidence. Such is the holding in the case of R. R. Comm. v. Shupee (Tex. Civ. App.) 57 S.W.(2d) 295, affirmed Id., 123 Tex. 521, 73 S.W.(2d) 505, and R. R. Comm. v. Lamb (Tex. Civ. App.) 81 S.W.(2d) 161. But the questions of whether a rate is confiscatory or unreasonable and unjust have been held to be legal or justiciable questions of fact, and as to which the wider scope of judicial appellate review seems to have been adopted by the Legislature and courts of this state. The limited scope of judicial review of rates fixed by an administrative commission was first enforced (Peik v. Chicago, etc. Ry. Co., 94 U. S. 164, 178, 24 L. Ed. 97) by the courts, but was soon abandoned, and through a process of trial and argument of

500

several cases, the present rule that the Fourteenth Amendment to the Constitution protects the property of citizens from confiscation by an act of the Legislature or by a commission to which legislative regulatory power has been delegated, was developed. State ex rel. Southwestern Bell Tel. Co. v. Pub. Serv. Com. (Mo. Sup.) 233 S. W. 425, 430.

But whether the scope of judicial review is a hearing de novo or the correction of nonpermissible error, the appeal is still merely corrective. The question is not whether the court, if the order were originally before it, would make the same order as was made by the commission, but only whether the commission has acted reasonably upon sufficient evidence, and whether any substantial right of the complaining party has been infringed. In determining the sufficiency of the evidence under the wider scope of judicial review, the question is not whether there is a scintilla of evidence to support the order, but whether the order is fairly and substantially supported by the evidence, when viewed in the light of the presumption in favor of the order, and the quantum and character of the evidence required to overcome such presumption. Particularly is this so with regard to making rates or division of rates, which are legislative and not judicial in character, and necessarily imply a range of legislative discretion, which the courts must recognize, and with which they cannot interfere except where constitutional or statutory rights are violated. The reason for the court appeal being corrective only is well stated in the Bell Telephone Case, supra, as follows: "The statutes declaring rates fixed by the Commission to be prima facie reasonable until that presumption is removed by one seeking their annulment are but a proper recognition of the power and purpose of the Commission, without which its acts would be mere empty declarations, whose effective operation would, in each instance, have to await judicial approval. Such a conception of the nature and powers of the Commission is wholly unauthorized. Organized, as the statute creating the Commission clearly declares, for the purpose of supervising and regulating public service corporations, the courts, in reviewing its actions, proceed upon the assumption that the experience of the members of the Commission has especially fitted them for dealing with questions concerning the powers and activities of such corporations; and,

despite the fact that the entire evidence will be reviewed, much consideration is to be given to the findings of the Commission, which, if reasonable, and neither arbitrary nor capricious, will be deferred to. New York ex rel. N. Y. & Queens County Gas Co. v. McCall, 245 U. S. [345], loc. cit. 347, 38 S. Ct. 122, 62 L. Ed. 337."

In the case of R. R. Commission v. Galveston C. of C., 105 Tex. 101, 145 S. W. 573, 580, which construed the similar statutes authorizing appeals from railroad rates fixed by the commission, and the statutory requirement that complainant show "by clear and satisfactory evidence that the rates are unreasonable and unjust," the scope of judicial appellate review was held to be as follows:

"The foregoing statute so guards the Commission from improper interference that the courts must regard its actions, when within the limits of its delegated powers, as being the result of a purpose to do justice between all parties, and as having resulted in just and correct action, until it be shown by clear and satisfactory evidence to be otherwise. R. R. Commission v. Weld & Neville, 96 Tex. [394], 409, 73 S. W. 529. The language 'clear and satisfactory evidence' limits the power of courts in setting aside rates, etc., to cases in which it may be established by evidence which leaves no reasonable doubt in the judicial mind that the rate or rule is unjust and unreasonable. Willis v. Chowning, 90 Tex. 617, 40 S. W. 395, 59 Am. St. Rep. 842. It is true that this attributes to the work of the Commission a high degree of verity; but it is the plain language of the law, and is, no doubt, a wise provision.

"It is not within the language nor the spirit of the law, which authorizes the courts to review the action of the Railroad Commission, that any court should investigate the methods adopted by the Commission in fixing its rates, nor the motives or purposes which prompted such action. The result and its effect upon the rights of railroads and shippers mark the limit of judicial inquiry."

The rules and statutory requirements are general in nature and their applicability necessarily depends upon the facts in each case. No rule can be laid down as to rates which will apply uniformly to all sorts of utilities. In determining whether a rate is confiscatory or unreasonable and unjust because it may not

in the future yield a proper return, the basis of calculation is the fair value of the property used in the public service. What may be a fair return for one may be inadequate for another, depending upon circumstances, competition or monopoly, public necessity, speculative and highly profitable enterprises, hazards, locality, and risk. And where as in the instant case the evidence is conflicting and the conclusion to be drawn therefrom in respect of this or that item uncertain or speculative, the court should not interfere with gas rates in advance of any actual experience of the practical result of such new rates. Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034; Brush Elec. Co. v. Galveston, 262 U. S. 443, 43 S. Ct. 606, 67 L. Ed. 1076; N. P. Ry. Co. v. North Dakota, 216 U. S. 579, 30 S. Ct. 423, 54 L. Ed. 624; Cedar Rapids Gas Light Co. v. Cedar Rapids, 223 U. S. 655, 32 S. Ct. 389, 56 L. Ed. 594; City of Louisville v. Telephone Co., 225 U. S. 430, 32 S. Ct. 741, 56 L. Ed. 1151; City of Knoxville v. Knoxville Water Co., 212 U. S. 1, 29 S. Ct. 148, 53 L. Ed. 371. Especially is this true where our statutes and the rate order here complained of provide that "this proceeding shall be kept open for such orders as may be proper." Immediately upon the rate in question being fixed, appellee applied to the courts to restrain its enforcement before an actual test was had under the reduced rate.

On the hearing before the commission as well as on appeal to the court, five primary factors were considered as essential to the correct determination of whether the rate was confiscatory or unreasonable and unjust because it did not allow a reasonable return on the fair value of the property of appellee used in the public service of delivering natural gas to the various city gates, as follows:

1. What was the present fair value of the property of appellee used in the public service?

2. What was a reasonable annual allowance for depreciation of such property?

3. What were the reasonably necessary operating expenses?

4. What were the reasonable operating revenues?

5. What was a reasonable rate of return on the property used?

·The fair value of the property used by appellee in the public service was determined by deducting from the reproduction cost new the accrued depreciation of such property. Since appellee was engaged in the integrated business of producing, purchasing, transporting, and selling natural gas to the distributing companies at the city gates of some 300 cities and towns in Texas and Oklahoma, it became necessary to allocate or segregate the property used in Texas as well as that used conjointly in both states, in order to determine the fair value of the property used in the Texas public service, the annual depreciation thereof, and the Texas operating expenses and revenue. In making the segregation and proof of fair value of the property, both the commission and appellee used calculations, estimates, and opinions of expert accountants and engineers. However, different methods of segregation were adopted by the parties. The method of segregation adopted by the commission provided for allocation to Texas operations or to intrastate commerce the value of all property located within the physical boundary of Texas. The short section of pipe line from Texas Panhandle field across the corner of Oklahoma and back into Texas was also allocated to Texas operations. Gas sales adjustment was made wherein Texas or intrastate operations were charged with the net amount of Oklahoma produced gas for the six years' (1929–1934) accounting period adopted by the commission. No charge against Oklahoma or interstate operations was made for the use of the transmission lines and for equipment within Texas, the effect of which was to give free transportation in Texas of all Oklahoma produced gas. Texas and Oklahoma expenses and revenues were allocated in general accord with the segregation of the physical properties. Under this method, the fair value of the property undepreciated used in Texas public service was $40,256,862.39, according to the calculations and opinions of the commission's experts. After deducting the operating expenses and annual depreciation, there remained for the last two years of the accounting period, being the two lowest revenue years of the period, Texas net revenue which would yield a return of 6.74 per cent. and 6.76 per cent., respectively. The method of segregation used by appellee was materially different. Under its method of segregation, all of the

gas produced or purchased by appellee in Texas Panhandle field and transported by its private pipe lines across the corner of Oklahoma and back into Texas for sale and use, and all Oklahoma produced gas were allocated to interstate commerce. The allocation was made by a determination of the specific gravity of the Oklahoma and Texas Panhandle gas on the one hand, and West Texas gas with which it was commingled in pipe lines on the other hand. It seems that the Oklahoma and Panhandle gas had about the same specific gravity. Appellee claimed that by determining the specific gravity of the gas in any particular pipe line, the percentage of Oklahoma-Texas Panhandle gas could be determined and allocated to that line. Appellee allocated operating expenses and revenue between the two states upon substantially the same basis as used for the property. An expert employed by appellee found the fair value of property used in Texas public service, based upon reproduction cost new, less depreciation, to be $38,350,882.32. He excluded from this calculation all property and equipment used in handling the Texas Panhandle field gas. If he had allocated such property to Texas and considered the fair value of the property as undepreciated, there would have been very little difference between his finding of fair value and that found by the commission's experts. However, in all their elaborate calculations, estimates, and opinions, the experts employed by the appellee allocated the Texas Panhandle gas to interstate commerce. We have held that this gas did not move in interstate commerce, and it necessarily follows that the testimony of the experts based upon the erroneous assumption that such gas did move in interstate commerce proved nothing material to this case. Appellee offered no other proof upon a correct segregation or allocation of the property, and the trial court erred in refusing the commission's motion for an instructed verdict and for judgment declaring the rate order appealed from to be valid in every respect. The burden was upon appellee to show by clear and satisfactory evidence a proper segregation of interstate and intrastate properties and business, and to show the value of the property employed in intrastate business or commerce and the compensation it would receive under the rate complained of upon such valuation. Having failed to make a proper segregation of interstate and intrastate properties, appellee did not adduce the quantum and character of proof necessary to establish the invalidity of the rate as being confiscatory, or unreasonable and unjust. Simpson v. Shepard, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Allen v. St. Louis, I. & M. S. R. Co., 230 U. S. 553, 33 S. Ct. 1030, 57 L. Ed. 1625; Smith v. Illinois Bell Tel. Co., 282 U. S. 133, 51 S. Ct. 65, 75 L. Ed. 255.

Clearly the difference in theory as to whether the gas produced or purchased by appellee in the Texas Panhandle field and transported by its private pipe line across a corner of Oklahoma and back into Texas, where it was intended at all times to be sold and used, accounts for most of the important difference with respect to the fair value of the property used in Texas public service, the annual depreciation thereof, and particularly as to the operating expenses and revenues. For instance, the Texas Panhandle gas cost appellee 2 cents per thousand cubic feet at the well; whereas, the gas from all other sources or fields cost from 6 to 10 cents per thousand cubic feet. The advantage in favor of appellee in excluding this gas from intrastate commerce is apparent. The cost of the 2-cent gas would add only about $125,000 annually to Texas operating expenses, according to Appellee's Exhibit No. 46; whereas, according to the same exhibit, which shows the percentage of the total cost of gas transported from the Panhandle field and sold in Texas, the Texas revenue would have been increased for the 1929–1933 period more than $1,500,000 annually; and calculations show that if other proper operating expenses were included and charged against the Panhandle gas, still the profit in such gas was more than in other gas handled by appellee either in Oklahoma or Texas. Thus the double advantage to appellee in freeing this gas from intrastate commerce and from state regulation is shown.

The appraisals also differ as to various units of transmission construction costs, due in a large measure to the difference in theory of segregation. Where they relate to the same property the appraisals are in every way comparable. Appellee used actual cost experiences and arbitrarily added 20 per cent. as possible contingencies. The commission allowed only actual cost experiences, which were substantiated by the testimony of contractors en-

gaged in excavation and general construction work. At most the evidence merely presented the difference of opinions of equally well-qualified experts. Manifestly this evidence, in absence of actual experience under the rate, does not meet the quantum and character of proof necessary to set aside the rate order as being confiscatory or unreasonable and unjust as to appellee.

 The greatest difference between the parties relates to a proper allowance for depreciation and amortization. Appellee estimated that for both Texas and Oklahoma properties, exclusive of gas leasehold depletions, the annual requirement for depreciation and amortization was $3,465,-123.36. The commission estimated that appellee should be allowed for annual depreciation and amortization of its Texas properties, exclusive of leaseholds, the sum of $831,946.08. The actual experience of the appellee for the seven-year period as shown by its books, is as follows:

"Jan. 1, 1927, to Dec. 31, 1933, inclusive

| Jan 1st | Balance | Accrual | Net Charges |
|---|---|---|---|
| 1927 | $ 8,294,762.08 | $1,280,856.10 | $ 245,097.73 |
| 1928 | 9,330,520.45 | 1,198,192.50 | 260,768.59 |
| 1929 | 10,267,944.36 | 1,190,062.06 | 450,335.00 |
| 1930 | 11,007,671.42 | 580,022.80 | 464,875.93 |
| 1931 | 11,122,818.29 | 1,841,779.61 | 720,014.28 |
| 1932 | 12,244,583.68 | 1,841,508.16(Credit62,725.18 |
| 1933 | 14,148,817.02 | 1,882,333.41 | 335,736.55 |
| 1934 | 15,695,413.88 | Total | $2,414,102.90" |

Thus it is shown that the depreciation allowance of appellee's experts is speculative, at war with the actual experience, and plainly excessive. Against $2,414,102.90 for the seven-year period as evidenced by appellee's books, its experts estimate annual depreciation and amortization at approximately $1,000,000 per year more. With respect to such proof, it was held in the case of Lindheimer v. Ill. Bell Tel. Co., 292 U. S. 151, 54 S. Ct. 658, 668, 78 L. Ed. 1182, that:

"The company has had abundant opportunity to establish its contentions. In seeking to do so, the company has submitted elaborate estimates and computations, but these have overshot the mark. Proving too much, they fail of the intended effect. * * *

"Elaborate calculations which are at war with realities are of no avail."

The commission adopted the sinking fund method for determining annual depreciation, which provides for an annual return on an undepreciated rate base; and which in addition to the annual depreciation of $831,946.08, also allowed 6 per cent. per annum on the accumulated depreciation reserve. The calculations and estimates of appellee applied to both Texas and Oklahoma properties, and since such calculations and estimates are so contrary to the experiences of the company, they do not meet the quantum and character of proof required with respect to judicial appellate review of utility rates fixed by an administrative commission or board. Dayton P. & L. Co. v. Pub. Utilities Comm., supra.

With respect to operating expenses, except as to a few controverted items, and with respect to revenues, there is no substantial difference in the testimony as to totals of both Texas and Oklahoma for the years of the accounting period. However, the same controversy arises as to a proper segregation of such expenses and revenues to each state. This difference has already been pointed out, and since appellee failed to make proper segregation of the expenses and revenues, it failed to prove its case.

Many items of operating expense are so contrary to the actual experiences of appellee, or are so large as to be excessive on their face. A few of these will be adverted to as showing that in proving too much appellee's experts proved nothing.

### Federal Taxes.

 An item of between three and four hundred thousand dollars a year is set aside by the experts as federal income and other taxes. The company has never paid an income tax, and its liability therefor is now in litigation. The only testimony in the record with regard to the amount that should be paid for taxes by appellee in its department of the corporate hookup was around $50,000 per annum. The testimony indicates that the Lone Star Gas Corporation, the holding company, has paid all of the income taxes for all of its affiliated companies; but if it be assumed that such payment is chargeable back to appellee company, a proper amount would not be more than $50,000 per year, instead of the three or four hundred thousand dollars charged against it by the experts. Galveston Electric Co. v. Galveston, 258 U. S. 388, 42 S. Ct. 351, 66 L. Ed. 678.

### Management Fees.

 The evidence shows that the holding corporation has charged appellee management fees ranging from $78,000 to around $100,000 per year. These fees ap-

pellee claims were earned by four persons, Crawford, Mitchell, Gregory, and Simpson. They are directors of one or the other corporations constituting the corporate set-up above referred to. Simpson seems to have rendered service as a purchaser of pipes for appellee. The item of pipes was the greatest of appellee's expenses. The evidence shows that if Simpson rendered any service in purchasing pipes at a discount, that no such discount would be any longer allowed, and that appellee would have to pay the quoted prices like any one else. Manifestly this service is not worth anything in the future. Besides, he rendered the services prior to 1929, when the management fee was originated, and no compensation was required before that time. Other management fees were charged, as legal fees, accounting fees, and engineering and supervision fees. Appellee was organized in 1909, with a capital stock of $2,500,000, half of which was paid for with gas leases owned by the incorporators. Since then its capital stock has been increased to $12,500,000. It borrowed on its unsecured note or open account $17,-600,000 from the holding corporation, which debt with others amounting to $19,-000,000 have been gradually reduced. The holding corporation borrowed this money from ½ to 2 per cent. less than it charged appellee. This ought to be sufficient management fees, if any should be demanded by the holding corporation. The holding corporation has been paid fair to large dividends annually on the stock of appellee owned by it. In addition, some of the holding company officers are paid salaries by appellee and the affiliated distributing companies. The proof as to the reasonableness of the management fee was not clear and satisfactory, as required to be under the aforementioned rule.

### New Business Expenses.

These advertising or new business expenses vary from $81,000 to $126,000 per annum. Appellee does business with the affiliated corporations. Besides sale of the industrial gas, the affiliated corporations sell to the domestic and local burner tip consumers. Appellee proved only a small amount of advertising, nothing in proportion to the charges made by the experts in their account. Except for a few items, it made no showing how much advertising it did for the affiliated distributing companies; and certainly this $100,000 annual expense for advertising is not supported by the quantum and character of evidence required.

### Canceled and Surrendered Leases.

The undisputed evidence shows that appellee has gas reserves which are adequate for 40 years to come. It has gas reserves in the largest gas fields in the world. Beginning in 1929, appellee began to charge off around $200,000 per annum for canceled and surrendered leases. In view of its admitted large gas reserves, which will last for 40 years, and in view of the fact that it is a matter of judicial knowledge that gas by the multiplied millions in cubic feet is being wasted daily because of the lack of a market, we think these large charges are unjustified. The commission allowed the company for its gas produced from company owned wells the full prevailing price. They eliminated production expenses, drilling and tool expenses, dry holes, and canceled and surrendered leases, because the method adopted of allowing the full prevailing field price concurrently paid to other gas owners necessarily eliminated such items. The owners of other gas wells bear all of these expenses, and it would seem that the price paid other owners includes all of these items of expense. West Ohio Gas Co. v. Public Utilities Comm., 128 Ohio St. 301, 191 N. E. 105. At any event, if appellee were entitled to some charge for leasehold depletions, the amount claimed was clearly too large and excessive. The burden was upon appellee to show that the charge was reasonable.

### Regulatory Commission and General Expenses.

The experts employed by appellee charged in excess of $400,000 per annum for regulatory commission and general expenses. The proof did not show the reasonableness of any item of such expense. There was some character of litigation in Oklahoma and this present litigation. If the entire expense should be spread over a period of years since 1909, when the appellee began to do business, it would amount to some $16,000 per year. A witness for appellee testified that such annual amount would be reasonable. It is, therefore, manifest that $50,000 per year or better for such expenses is too much. This defendant began business in 1909, with a comparatively small capital stock. It has now a capital stock of $12,500,000, which is fully paid up. It owes approximately

$17,600,000; it has properties in Oklahoma and Texas of the aggregate value of $75,000,000. Allocated to Texas public service is property valued at $40,000,000. Appellee offered evidence covering only about 3½ years next preceding the fixing of the rate as to its operating expenses. These calculations covered the depression years, which, of course, are the worst in its history; and even at that the last year shows an upward trend in its business. It is not shown to have lost money at any time, nor to have failed to earn a fair return upon the property allocated to Texas, not even for the year 1933, which was the most abnormal one from the standpoint of temperature and financial depression. Its experts testified that its property is almost 85 per cent. perfect. From the very beginning appellee has been favored, enjoying a clear monopoly with all the rights of eminent domain. There is nothing in the history of appellee's business experience which would justify the exorbitant and large account sought to be charged in this item of expense.

## Going Value.

█ In arriving at its rate base appellee included an item of more than $7,000,000 as "going value." Appellee has not experienced any losses on account of inception costs, which are usually included in going value. With the exception of a few small items, inception costs of all kinds have been included in reproduction cost new calculations. Appellee's business was valued as an assembled and going business. The business has always been profitable, and all inception costs have no doubt been long since paid out of rates heretofore charged and collected. The reproduction cost new value, as determined in the instant case, allows for all overhead expense, which, together with the reasonable operating expenses allowed, fully compensate appellee for all development costs which have been incurred, and are ample to cover items entering into and forming a part of what is referred to as "going concern value." The following authorities show clearly the impropriety of allowing going concern value under the facts of the instant case. Los Angeles Gas & Electric Corp. v. R. R. Com., 289 U. S. 287, 53 S. Ct. 637, 77 L. Ed. 1180; Columbus Gas & Fuel Co. v. Pub. U. Com., 292 U. S. 398, 54 S. Ct. 763, 78 L. Ed. 1327, 91 A. L. R. 1403; Dayton Power & Light Co. v. Utility Com., 292 U. S. 290, 54 S. Ct. 647, 78 L. Ed. 1267;

Galveston Electric Co. v. Galveston, 258 U. S. 388, 42 S. Ct. 351, 66 L. Ed. 678; Id. (D. C.) 272 F. 147.

## Rate of Return.

█ It is the contention of appellee that the jury may have found that a 6 per cent. rate of return was confiscatory or unreasonable and unjust. The issue of confiscation was not submitted to the jury, and we are clear in the view that the evidence adduced by appellee did not raise a jury question as to whether a 6 per cent. rate of return was either confiscatory or unreasonable and unjust. The commission found that a 6 per cent. rate of return on the fair value of the property used in the public service, after allowing for all reasonable operating expenses and for depreciation and amortization, was sufficient. The burden was heavily upon appellee to show by clear and satisfactory evidence that such rate of return was confiscatory or unreasonable and unjust. To meet this test appellee was required to establish "by evidence which leaves no reasonable doubt in the judicial mind that the rate or rule is unjust and unreasonable." R. R. Comm. v. Galveston, C. of C., supra. This appellee did not do. It offered the testimony of an interested witness and the testimony of experts employed by it to the effect that in their opinion an 8 per cent. or 10 per cent. rate of return would be reasonable. A disinterested expert testified that under present business conditions a 6 per cent. rate of return was entirely fair and reasonable. This evidence merely presented the difference of opinion of experts, and manifestly their opinion or opinions cannot be substituted for the finding of the commission that a 6 per cent. rate of return was fair and reasonable, which finding was based upon substantial evidence. In fact, 6 per cent. per annum is the legal or statutory rate of interest in this state, and appellee offered no evidence which even tended to show that a 6 per cent. rate of return would confiscate its property, or was unreasonable or unjust. And since the rate order was calculated upon the fair value of the property used in the public service, after allowing very reasonable operating expenses and depreciation and amortization allowances, no reason exists why the 6 per cent. rate of return should be declared confiscatory; but, to the contrary, it should be held to allow a fair and reasonable rate of return on the property dedicated to the public service by appellee.

A 6 per cent. rate of return has been held not confiscatory in the following cases: Willcox v. Consolidated Gas Co., 212 U. S. 19, 48, 50, 29 S. Ct. 192, 53 L. Ed. 382, 48 A. L. R. (N. S.) 1134, 15 Ann. Cas. 1034; Cedar Rapids Gas Light Co. v. Cedar Rapids, 223 U. S. 655, 670, 32 S. Ct. 389, 56 L. Ed. 594; Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 172, 35 S. Ct. 811, 59 L. Ed. 1244. See, also, Stanislaus County v. San Joaquin & King's River C. & I. Co., 192 U. S. 201, 216, 24 S. Ct. 241, 48 L. Ed. 406; West Ohio Gas Co. v. Public Utilities Com., 128 Ohio St. 301, 191 N. E. 105, 115; State ex rel. Capital City Water Co. v. Public Service Comm. of Missouri, 298 Mo. 524, 252 S. W. 446, 454–459.

■ We are also clear in the view that where a state commission fixes a utility rate so as to allow a 6 per cent. rate of return on the property used in the public service, the courts will not, prior to a fair test of such rate, declare same void, unless the evidence establishes that it is confiscatory or invalid as a matter of law. Denver Union Stock Yard Co. v. United States (D. C.) 57 F.(2d) 735, 752, 753; State v. Public Service Com., 298 Mo. 524, 252 S. W. 446, 458; Knoxville v. Water Co., 212 U. S. 1, 15, 29 S. Ct. 148, 53 L. Ed. 371; West Ohio Gas Co. v. Public Utilities Comm., 128 Ohio St. 301, 191 N. E. 105, 110; Cedar Rapids Gas Light Co. v. Cedar Rapids, 223 U. S. 655, 666, 670, 32 S. Ct. 389, 56 L. Ed. 594; Willcox v. Consolidated Gas Co., 212 U. S. 19, 51, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034; Railroad Com. of Louisiana v. Cumberland Tel. & Tel. Co., 212 U. S. 414, 426, 29 S. Ct. 357, 53 L. Ed. 577.

The calculations, estimates, and opinion of its experts show a studied effort on the part of appellee to charge large items as operating expenses and depreciation, at war with the actual experience of the company, and we find no proof which would authorize the trial court to submit any issue to the jury, but find that appellee wholly failed to meet the burden of proof placed upon it, and to show by clear and satisfactory evidence that the rate was confiscatory, unjust, and unreasonable as to it. Especially is this true in view of the rule that absent actual experience under the rate fixed, the courts will not disturb a rate where the evidence is so conflicting, and the conclusions to be drawn therefrom in respect to this or that item uncertain and speculative; and particularly is this true where, as in the instant case, if it be shown in actual experience that the rate would not afford a reasonable return and was confiscatory, appellee is free to make another application for relief before the commission.

Judgment of the trial court declaring the rate to be unjust and unreasonable is reversed. The injunction granted by the trial court is dissolved, and the city gate rate of 32 cents fixed by the commission is declared to be just, reasonable, and valid in every particular.

Judgment of trial court reversed; injunction dissolved.

On Appellee's Motion for Rehearing.

■ On motion for a rehearing appellee makes the claim that the record does not sustain some of our findings of fact. Most of the asserted discrepancies relate to the valuation of the property used in the public service, or to alleged necessary operating expenses. We held that as a matter of law appellee failed to establish by clear and satisfactory evidence the ultimate fact issue, to wit: Whether the rate fixed by the commission was so low as not to afford a reasonable return on the fair value of the property used in the Texas public service. Appellee was afforded a seven months' hearing before the commission and a three months' trial on appeal to the court. It made no segregation as between its Texas and Oklahoma properties and operations; and did not prove the fair value of the property used in the Texas public service. The question of the value of such property determines the reasonableness of the rate, and probably, in the ultimate analysis, adequacy of service and principles of financing. Valuation of such public service property is in the main a matter of estimate or opinion, and closely resembles discretion as regards the finding of value by an administrative commission. In any event, a scientific or statutory standard of absolute value is unattainable; and because of this uncertainty of value, except where the evidence clearly shows gross over or under valuation, or mistake, inequality, or fraud in the appraisal, the finding of value by an administrative commission is generally given finality. Especially is this the rule in absence of an actual test under the new rate. In addition to the authorities cited in the original opinion, see the following: People v.

Board of Assessors, 39 N. Y. 81; Taylor v. L. & N. R. Co. (C. C. A.) 88 F. 350; Chicago v. Burtice, 24 Ill. 489; State Railroad Tax Cases, 92 U. S. 575, 23 L. Ed. 663; Hilton v. Merritt, 110 U. S. 97, 3 S. Ct. 548, 28 L. Ed. 83; People v. State Board of Tax Com'rs, 196 N. Y. 39, 89 N. E. 581.

Motion overruled.